UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

WENDYLL JONES,

                        Petitioner,

     -vs-

CALVIN WEST,

                     Respondent.
_____

**DECISION AND ORDER**
**No. 03-CV-6107(VEB)**

## INTRODUCTION

Petitioner, Wendyll Jones ("Jones"), filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction following a jury trial on April 23, 1998, in New York State Supreme Court (Monroe County) on four counts of robbery in the second degree. Jones was sentenced to a determinate term of fifteen years in prison and is currently in custody. The parties have consented to disposition of this matter by the undersigned pursuant to 28 U.S.C. § 636(c).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The conviction at issue here stems from Jones' alleged involvement in the robbery of Constance Horton ("Horton") and Corban Rodman ("Rodman") on June 25, 1996. At about 11:15 p.m., Horton and Rodman were robbed at gun-point as they were getting into Horton's car after purchasing dinner at Subway restaurant on Monroe Avenue in the City of Rochester. Prior to arriving at Subway, Horton had picked up Rodman from his job at the Delta Sonic Car Wash. Horton and Rodman paid for their food with a twenty-dollar bill, and received seven dollars in

change (a five-dollar bill and two one-dollar bills). After they purchased their food, Horton and Rodman returned to Horton's vehicle, which was parked in the parking lot behind subway. T.29-32, 59-60, 89-92.[1]

As Horton was unlocking the driver's-side door, she noticed a man and a woman approaching them from Monroe Avenue, but she thought nothing of it. Horton opened the door and got in the car. Rodman was about to get into the car on the passenger's side when a man put a gun to Rodman's head and demanded money. T.32, 92, 169. The woman also approached them but stayed somewhat behind the man who was demanding money from Rodman. T.169. Horton identified Jones in court as the who had approached them, and said that he was about 5'10" or 5'11"-tall; wearing a brown flannel shirt, a zipped-up sweatshirt with a hood, and dark pants; and having a goatee and mustache. T.33.  According to Horton and Rodman, the gun used by the robber was unique and had an "old-fashioned" look to it.

Horton passed the change she had just received at Subway over to Rodman; Jones grabbed it out of Rodman's hand. Jones then said, "That is not all, give me the rest of the money." T.37. Rodman handed the submarine sandwiches to Jones along with his own wallet. Jones tossed the sandwiches and the wallet to the female companion who was still standing behind them. T.37-38, 170. Jones and the woman left the Subway parking lot and entered a car parked a short distance away. T.40, 172-73.

After Jones and his companion entered their car, Rodman got out of Horton's car and attempted to get the license plate number. T.174. Horton followed the perpetrators in her car until she was able to write down the license plate number, at which point she returned to Subway and

---

[1]     Citations to "T.___" refer to the trial transcript.

called 911. T.42-45.

Within minutes of hearing a 911-broadcast regarding the robbery, Officer Carpinelli of the Rochester Police Department spotted the suspect's vehicle on East Main Street in the City of Rochester. After confirming the license plate number, Officer Carpinelli activated his emergency lights in an attempt to stop the vehicle. The vehicle did not stop immediately, and Officer Carpinelli saw papers being thrown out the passenger's-side window. The car eventually came to a stop near the corner of Railroad and Fourth Streets. T.96-99.

Officer Carpinelli approached the driver's side of the vehicle while Officer Colucci, who had just arrived on the scene, approached the passenger's side. As Officer Colucci neared the car, he saw a revolver-type gun drop from the car onto the roadway. T.125-26. Officer Carpinelli asked Jones, the driver of the vehicle, where he was coming from. Jones replied, "Subway." T.104. Jones was then taken into custody and placed into Officer Carpinelli's patrol vehicle. T.104-07. The two other occupants of the vehicle, a black man and a black woman, were also taken into custody. T.127.

On the rear floor of the suspect vehicle, the officers observed two Subway sandwiches. Rodman's wallet was found underneath the sandwiches. T.110, 130. Also located at the scene were personal papers which had been in Rodman's wallet at the time it was stolen. T.16-21. About five minutes after placing Jones in the patrol car, Officer Carpinelli returned to the car to check on him. After opening the door, Officer Carpinelli observed seven dollars (one five-dollar bill and two one-dollar bills) on the floor by Jones' feet. According to Officer Carpinelli, Jones was the only person in the rear of the car that evening. T.107.

Within an hour of the incident, Jones was transported back to Subway for a show-up

identification procedure. Horton and Rodman identified him as the person who had robbed them earlier that night. T.46, 176-77. Horton and Rodman also identified the gun dropped from the passenger's-side door of the suspect vehicle as the weapon used by Jones during the robbery. T.34, 177-78.

The jury returned a verdict convicting Jones as charged in the indictment. Jones was sentenced on July 2, 1998, as a second felony offender to a determinate term of fifteen years in prison. Notice of appeal was filed on July 20, 1998. On October 7, 1998, Jones filed a *pro se* motion to vacate the judgment pursuant to New York Criminal Procedure Law ("C.P.L.") § 440.10, which was denied by the trial court on September 12, 2001. Leave to appeal the denial of the C.P.L. § 440.10 motion to the Appellate Division, Fourth Department, of New York State Supreme Court, was denied. On December 21, 2001, the Appellate Division unanimously affirmed Jones's conviction on direct appeal. *People v. Jones*, 289 A.D.2d 962, 738 N.Y.S.2d 260 (App. Div. 4th Dept. 2001). Leave to appeal to the New York Court of Appeals was denied on May 14, 2002.

This timely habeas petition followed. Respondent does not raise the defense of non-exhaustion and it appears that all of Jones' habeas claims have been fully exhausted and are properly before this Court for review.

## DISCUSSION

### Standard of Review

To prevail under 28 U.S.C. § 2254, as amended by the Anti-terrorism and Effective Death Penalty Act ("AEDPA") in 1996, a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a

decision that was contrary to, or involved an unreasonable application of, clearly established

Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual

determination in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d)(1), (2);

*Williams v. Taylor*, 529 U.S. 362, 375-76, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

An "adjudication on the merits" is a "substantive, rather than a procedural, resolution of a

federal claim." *Sellan v. Kuhlman*, 261 F.3d 303, 313 (2d Cir. 2001) (quotation omitted). Under

the "contrary to" clause, "a federal habeas court may grant the writ if the state court arrives at a

conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state

court decides a case differently than this Court has on a set of materially indistinguishable facts."

*Williams v. Taylor*, 529 U.S. at 412-13 (O'Connor, J., concurring and writing for the majority in

this part). The "unreasonable application" clause is applicable when "the state court identifies the

correct governing legal principle from this Court's decisions but unreasonably applies that

principle to the facts of the prisoner's case." *Id.* at 413. Under this standard, "a federal habeas

court may not issue the writ simply because that court concludes in its independent judgment that

the relevant state-court decision applied clearly established federal law erroneously or

incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. In order to grant the

writ there must be "some increment of incorrectness beyond error," although "the increment need

not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark

as to suggest judicial incompetence." *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)

(internal quotation marks omitted).

**<u>Merits of the Petition</u>**

**1.       Erroneous sentencing of petitioner as a second felony offender**

Jones contends that the trial court erred when it sentenced him as a "predicate felon (second felony offender)." Petition, ¶22(A) (Docket No. 1). Jones explains that with respect to a prior 1993 conviction for robbery, he was a "prime candidate for youthful offender [status], and was told by trial counsel that he would indeed receive a youthful offender adjudication." *Id.* On the 1993 conviction, however, he was not granted youthful offender status. When he appealed his conviction on the robbery charges at issue here, Jones contended that the 1993 conviction was unconstitutional because he had been denied the effective assistance of counsel, in that defense counsel allegedly had misled him into believing that he was going to receive a youthful offender adjudication.

The Appellate Division rejected the claim as follows:

> Defendant contends that Supreme Court erred in sentencing him as a second felony offender because his underlying felony conviction was obtained in violation of his constitutional rights. We disagree. We reject the contention of defendant that he was denied effective assistance of counsel during the plea proceeding and at sentencing with respect to that prior conviction. As the court properly determined following the second felony offender hearing, defendant failed to meet his burden of demonstrating unconstitutionality on that ground. . . .

*People v. Jones*, 289 A.D.2d at 962 (internal citations omitted).

In *Lackawanna County District Attorney v. Coss*, 532 U.S. 394, 121 S.Ct. 1567, 149 L.Ed.2d 608 (2001), the Supreme Court held that

> once a state conviction is no longer open to direct or collateral attack in its own right . . . the conviction may be regarded as conclusively valid. . . . If that conviction is later used to enhance a criminal sentence, the defendant generally may not challenge the enhanced sentence through a petition under § 2254 on the ground that the prior conviction was unconstitutionally obtained.

*Id.* at 403-04.  The Supreme Court has recognized an exception to the general rule stated above when petitioners challenge an enhanced sentence on the basis that the prior conviction used to

enhance the sentence was obtained "where there was a failure to appoint counsel in violation of the Sixth Amendment, as set forth in *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)." *Id.* (noting that the "special status of *Gideon* claims in this context is well established" in its case law) (citing *Custis v. United States*, 511 U.S. 485, 496-497, 114 S.Ct. 1732, 128 L.Ed.2d 517 (1994) (The "failure to appoint counsel for an indigent [is] a unique constitutional defect . . . ris[ing] to the level of a jurisdictional defect," which therefore warrants special treatment among alleged constitutional violations.")' *United States v. Tucker*, 404 U.S. 443, 449, 92 S.Ct. 589, 30 L.Ed.2d 592 (1971); *Burgett v. Texas*, 389 U.S. 109, 115, 88 S.Ct. 258, 19 L.Ed.2d 319 (1967)). Thus, "[w]hen an otherwise qualified § 2254 petitioner can demonstrate that his current sentence was enhanced on the basis of a prior conviction that was obtained where there was a failure to appoint counsel in violation of the Sixth Amendment, the current sentence cannot stand and habeas relief is appropriate. *Id.* at 405 (citing *United States v. Tucker*, 404 U.S. at 449 (affirming vacatur of sentence that was based in part on prior uncounselled state convictions).

The foregoing cases make clear that the Supreme Court has sharply distinguished between collateral attacks to previous convictions used to enhance a sentence based on the actual failure to appoint counsel and those based on other possible trial defects, including the denial of the effective assistance of counsel. *Daniels v. United States*, 532 U.S. 374, 376, 121 S.Ct. 1578, 149 L.Ed.2d 590 (2001) ("[W]ith the sole exception of convictions obtained in violation of the right to counsel, a defendant has no right to bring such a challenge in his federal sentencing proceedings.") (citing *Custis*, 511 U.S. at 487) (granting *certiorari* to determine whether a defendant in a federal sentencing proceeding may collaterally attack the validity of previous state

convictions that are used to enhance his sentence under the Armed Career Criminal Act on the basis that they were the product of allegedly faulty guilty pleas and ineffective assistance of counsel; holding that a defendant has no such right unless he is asserting that his conviction was obtained in violation of the *Gideon* right to appointed counsel). The Supreme Court has reiterated that challenges based on ineffective counsel do not rise to the level of a constitutional defect that would permit a collateral attack on a prior conviction. *Coss*, 532 U.S. at 404 (citing *Daniels*, 532 U.S. at 378) (citation omitted).

In the present case, it is true that Jones' 1993 conviction in which he was denied youthful offender status was used by the prosecution as a basis for having him adjudicated as a second felony offender. This in turn enhanced his sentence under the 1998 conviction for second degree robbery. However, Jones has not challenged the 1993 conviction on the basis that there was a complete failure to appoint defense counsel. Rather, Jones argues that the 1993 conviction was unconstitutional because the counsel who was appointed to represent him did not provide the "effective assistance" to which he was entitled under the Sixth Amendment because, in effect, his trial counsel allegedly falsely informed Jones that he would receive youthful offender status. Because Jones is not claiming, and indeed cannot claim, that there was a failure to appoint counsel, he cannot invoke the *Gideon v. Wainwright* exception to the bar on using federal habeas to collaterally attack a prior conviction underlying a sentence enhancement. Therefore, Jones is precluded from challenging the 1993 conviction on federal habeas review on the basis that it was unconstitutional and should not have been used to enhance his sentence under the 1998 conviction. *Accord Bellamy v. Fischer*, No. 05 Civ. 2840(DC), 2006 WL 2051038, *6 (S.D.N.Y. July 24, 2006) ("While Bellamy's 1990 Conviction clearly was used to enhance his sentence

under his 1995 Conviction, Bellamy has not raised a challenge to the 1990 Conviction based on failure to appoint counsel. Rather, he challenges his conviction based on ineffective assistance of counsel. Hence, the exception to the bar on collaterally attacking a conviction underlying a sentence enhancement does not apply, and Bellamy cannot challenge the 1990 Conviction on grounds that it was unconstitutional and should not therefore be used to enhance his sentence under the 1995 Conviction."). Accordingly, Jones' sentencing claim is denied.

## 2.     *Batson* violations

Jones contends that the prosecutor exercised his peremptory challenges in a racially discriminatory manner and that his reasons for discharging certain black prospective jurors were pretextual. In reviewing the *voir dire* transcript, the Court has discovered that the prosecution exercised peremptory strikes against six (6) black jurors (Ms. Peters, Ms. Benbow, Mr. Barry, Ms. Hanna, Ms. Thompson, and Ms. Seawright); the trial court denied the peremptory strike as to Mr. Barry and granted them as to the remaining five jurors.

### a.     The General Standard

In *Batson v. Kentucky*, 476 U.S. 79, 84, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court reaffirmed that a state's purposeful exclusion of jurors based on race violates the Equal Protection Clause of the Constitution. *Batson* resolved certain evidentiary problems faced by defendants attempting to establish racial discrimination in the exercise of peremptory challenges and held that a defendant can establish a *prima facie* case of purposeful discrimination by offering evidence solely from the *voir dire* at his trial.  *Batson*, 476 U.S. at 96 (rejecting the "crippling" burden of proof imposed by *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)). The Supreme Court went on to establish a three-step burden-shifting

framework, akin to that employed in Title VII employment discrimination cases, for evaluating a claim that a peremptory strike was race-based. *Id.* at 96-98.

First, the movant–*i.e.*, the party challenging the other party's attempted peremptory strike–must make a *prima facie* case that the nonmovant's peremptory challenge is based on race. *Id.*; *accord Hernandez v. New York*, 500 U.S. 352, 358, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Next, the nonmovant must adduce a race-neutral reason for the challenge. *Batson*, 476 U.S. at 97-98; *Hernandez*, 500 U.S. at 358-59. At this step, the nonmovant's burden of production in response is quite low. *See Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (*per curiam*) (holding that in response to a *Batson* claim, the race-neutral reason given at step two by the nonmoving party need not be persuasive or even plausible).

Lastly, the trial court must determine whether the moving party carried its burden of demonstrating by a preponderance of the evidence that the peremptory challenge at issue was based on race. *Batson*, 476 U.S. at 96, 98; *Hernandez*, 500 U.S. at 359. This burden remains with the moving party throughout the first two *Batson* steps even though the nonmovant has the burden of production at the second step; "[i]t is not until the *third* step that the persuasiveness of the justification becomes relevant–step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett*, 514 U.S. at 768 (emphasis in original).

*Batson* held that to make out a *prima facie* case, a defendant must demonstrate that (1) he is a member of a "cognizable racial group"; (2) that the prosecutor has exercised peremptory challenges to remove from the juror *venire* persons of the defendant's race; and (3) that these facts and any other relevant circumstances raise an inference that the prosecutor used the peremptory

challenges to exclude potential jurors. *Batson*, 476 U.S. at 96. The Second Circuit  discussed the

elements of a *prima facie* case in *Overton v. Newton* and the guidelines to be used by trial courts

in assessing whether a party, in fact, has established the first step:

> To establish a *prima facie* case under *Batson*, a defendant must show that the
> circumstances surrounding the peremptory challenges raise an inference of
> discrimination. Specifically, . . . [i]n deciding whether the defendant has made the
> requisite [*prima facie*] showing, the trial court should consider all relevant
> circumstances. For example, a "pattern" of strikes against black jurors included in
> the particular venire might give rise to an inference of discrimination. Similarly,
> the prosecutor's questions and statements during *voir dire* examination and in
> exercising his challenges may support or refute an inference of discriminatory
> purpose.

*Overton*, 295 F.3d 270, 277-78 (2d Cir. 2002) (citing *Batson*, 476 U.S. at 96-97). The Second

Circuit has instructed that reviewing courts must "look to the totality of the circumstances" and

has noted that other circuits similarly have used a "multi-factor analysis in analyzing *prima facie*

showings under *Batson*." *Harris v. Kuhlmann*, 346 F.3d 330, 345 (2d Cir. 2003) (quoting

*Tankleff v. Senkowski*, 135 F.3d 235, 249 (2d Cir. 1998) and citing *McCain v. Gramley*, 96 F.3d

288, 292 (7th Cir. 1996) ("Courts must look to the totality of the circumstances."), *cert. denied*,

520 U.S. 1147, 117 S.Ct. 1320, 137 L.Ed.2d 482 (1997)).

**b.**     **The *Batson* Challenge Trial Record**

**1.)     Round One of Prospective Jurors**

In the first round, twenty-one prospective jurors were questioned. *See* T.31-84.  There

were seven Black jurors (Ms. Jefferson, Ms. Peters, Ms. Benbow, Ms. Hanna, Ms. Hayward, Ms.

Dixon, and Mr. Barry) and fourteen jurors who were Caucasian. After the initial questioning was

completed, the trial court asked if the attorneys had any challenges for cause.

The prosecutor first challenged a Caucasian juror, Mr. Grieco for cause, on the basis that

he had "an inability . . . to understand and recall things[.]" T.84-85. The prosecutor also

challenged Ms. Hayward, a Black female, for cause, because she had indicated that she was

currently represented by the public defender's office, which also was representing Jones. T.85.

Finally, the prosecutor challenged for cause Ms. Benbow, a Black female, on the basis that she

knew "a friend of the Defendant" and that "her sitting as a fair and impartial juror would not be

the case in this [matter.]" T.86-87.

Defense counsel opposed the challenge as to Ms. Benbow. He himself challenged Ms.

Kenny, a Caucasian who had clearly indicated that she could not be fair; she had explained that

her niece had been raped and murdered, and that the perpetrator was Black. T.87. Defense

counsel also challenged Ms. Dixon, a Black female for cause; her son had been killed and she

emphatically stated during *voir dire*, "I hate guns!"

The trial court denied the challenges for cause as to Ms. Benbow and Mr. Grieco, and

granted the challenges for cause as to Ms. Hayward, Ms. Dixon, and Ms. Kenny. That left five

black jurors (Ms. Peters, Ms. Jefferson, Mr. Barry, Ms. Benbow, and Ms. Hanna) still in the

panel of twenty-one prospective jurors.

The trial court then announced that it would do peremptory challenges after the lunch

recess, but the attorneys stated that they were ready at that time. Apparently, both attorneys

informed the trial court of their peremptory challenges in a colloquy that was not placed on the

record. T.90.  When they went back on the record, defense counsel, Mr. Kasperek, made his

*Batson* motion:

| | |
|---|---|
| Mr. Kasperek: | I am making a *Batson* challenge on Ms. Peters. |
| The Court: | Mr. Curran [the prosecutor]. |
| Mr. Curran: | Regarding Mr. Kasperek's making a *Batson* challenge, I ask |

| | |
|---|---|
| | the Court to take a look at the make up [of the jury], the foreperson of the jury, Mrs. Jefferson, is an African American. Obviously, Judge, there is – |
| The Court: | Ms. Peters is sitting in what seat? |
| Mr. Curran: | Number ten, Judge. |
| The Court: | Do you have the sheet? I will deny the objection for the challenge by Mr. Kasperek. |

T.90-91. The transcript indicates that there then was a discussion off the record. T.91. When the proceedings resumed on the record, the trial court announced as follows: "It appears that we do have one or more minority members on the jury, on the sworn jury. We have seven sworn jurors, so it would be the next five prospective jurors." T.91.[2] It appears that Ms. Jefferson was seated as foreperson and, because she was Black, the trial court appears to have decided that the prosecution had no racial motive in exercising a peremptory against Ms. Peters.  Evidently, this was the basis for the trial court's decision that Jones had not established a *prima facie* case so as to require the prosecutor to articulate a race-neutral reason for striking Ms. Peters. At that point, there was another discussion off the record. *Id.*

Defense counsel at a later time proceeded to address the prosecutor's other peremptory strikes, namely, the strikes as to Mr. Barry, a Black male, and Ms. Hanna, a Black female:

| | |
|---|---|
| Mr. Kasperek: | Mr. Curran's selections with respect to removing, in particular, Mr. Barry, who is number 15, and Ms. Hannah,[3] who is number 18, I would point out to the Court and ask the Court to revisit the earlier *Batson* decision [with regard to Ms. Peters] that now but more [sic] Mrs. Jefferson, all the black potential jurors have been removed from the panel, three of them by Mr. Curran for peremptory challenges. And then I have further comment, if you wish, |

---

[2]        The seating and swearing-in of these seven jurors was not placed on the record and is not in the *voir dire* transcript.

[3]        This juror's name is spelled both as "Hannah" and "Hanna" in the transcript.

-13-

|              | Judge, to support my initial application, and then a response, depending on the People's response. |
|--------------|----|
| The Court:   | Mr. Curran? |

T.91. At this point, it would appear that the trial court agreed that Jones had set forth a *prima facie* case with respect to those three jurors and was looking to the prosecutor, Mr. Curran, to provide a race-neutral reason with respect to Mr. Barry, Ms. Hanna, *and* Ms. Peters. The prosecutor responded as follows:

| Mr. Curran:   | Well, Judge, first of all, there have been peremptory challenges, the one initial challenge was made by Mr. Kasperek, removing Ms. Dixon, so -- |
|---------------|----|
| Mr. Kasperek: | That was for cause. |
| The Court:    | That was for cause. |
| Mr. Curran:   | I understand that, Judge. Judge, there are, again, I point out, what will be the foreperson of the jury is an African American. Mr. Barry [whom the prosecutor was attempting to strike] is of the same general age as Mr. Jones, can relate as to that respect to Mr. Jones. When questioning him, Mr. Barry did not appear to be looking – or looking in other directions.<br><br>In respect to Ms. Hannah, Judge, she's got a son that's had numerous legal problems, she's got a nephew that's had legal problems. Certainly those are all race neutral reasons, Judge, that would concern me as sitting as fair and impartial juror. Quite frankly, Judge, their race has absolutely nothing to do with that. |

T.92. At that point, with respect to Mr. Barry and Ms. Hanna, the prosecutor had provided facially race-neutral reasons for striking them. The Court notes that even though defense counsel brought up Ms. Peters again, the prosecutor failed to articulate a reason for striking her. Defense counsel immediately addressed the reasons proffered as to Mr. Barry and Ms. Hanna and argued that they were pretextual:

| Mr. Kasperek: | Judge, if I may, the first issue regarding Mr. Barry is pretextual, in my opinion. His age has nothing to do with |
|---------------|----|

-14-

his ability to deliberate. We have members of variant age who have children, they have indicated, of the same age as my client. Mr. Barry did not respond frequently to any individual questioning as based upon my observations of the jury. There were a number of individuals who, at some point, either became bored with my questions, with Mr. Curran's questions, and although they looked away, I'm sure they weren't bored with the Court's questions, so the mere manner, his physical appearance is not sufficient, in my opinion to support that contention.

Mr. Barry is being removed, quite obviously, because he is of the same race as my client.

Miss Hannah is a black female and although Mr. Curran has put on the record that he is concerned about the fact that she has children who were involved in the criminal justice system, he raised no such concerns regarding the other jurors who had similar circumstances, Mr. Paradise, in particular, a white male, indicated that his son was charged and convicted of a crime. . . . There were other individual who indicated that they had relatives who were charged with crimes. So I think that that is also a pretextual response and would ask that the court deny that application. Ms. Benbow is the other black female who was involved. She's indicated, that was Mr. Curran's initial application for her was regarding a cause challenge, he offered no contentions regarding her for her removal, and in lieu of the fact he hasn't offered any explanation regarding my initial challenge, it appears to me that the Court is obligated to find that there are no challenges and that she should be seated.

T.93-94. Defense counsel then elaborated on his previously stated renewal of the *Batson*

challenge with regard to Ms. Peters:

Mr. Kasperek:        Judge, I asked the Court to initial [sic] to consider its ruling regarding Miss Peters. I would indicate to the Court that Miss Peters has none of these characteristics to which Mr. Curran has related. She is a retired employee of General Motors, she is involved, and she at my recollection had – no particular inquiry was made of her regarding any circumstances. She has two children whose ages were not indicated and there was no inquiry of the circumstances

-15-

regarding those children. And, in point of fact, she distinguishes herself as a member of the jury, quite frankly, and did so in all of her physical demeanor in front of the Court, so I would ask the Court to, first of all, grant my application regarding the current *Batson* challenge and revisit the application regarding Miss Peters. Thank you.

T.94-95.

The trial court responded, "[t]he Court denies the application to revisit the challenge to Ms. Peters." T.95. Inexplicably, the trial court summarily denied the application to revisit the challenge to Ms. Peters; it appeared to accept the prosecutor's previous justification for striking her, which was that there was one Black person seated on the jury (Ms. Jefferson).[4] (The prosecutor had noted, "[A]gain, I point out, what will be the foreperson of the jury is an African American." T.95.) With respect to Mr. Barry, the trial court stated that it was "going to disallow the [prosecutor's peremptory] challenge" because "[t]here has not been a satisfactory neutral explanation for that challenge." T.95.  The trial court permitted the prosecutor to peremptorily challenge Ms. Hanna and Ms. Benbow,[5] stating that "Miss Benbow, I believe, indicated some relationship to a close friend or to a friend of the Defendant and the other juror [Ms. Hanna] did indicate family members who had been involved with the criminal justice system[.]" *Id.*

---

[4]     Based on the facts surrounding the peremptory challenge of Ms. Peters, it is possible that the judge denied defense counsel's challenge on the basis that Ms. Peters was the prosecution's first peremptory after one Black juror had been seated without objection, perhaps because he saw no pattern at that point.  However, after a pattern appeared to develop, and even after denying one prosecutorial peremptory, the trial judge declined to revisit the challenge to Ms. Peters.

[5]     As noted above, the prosecutor had challenged Ms. Benbow for cause, but that was denied. The actual challenges were done off-the-record; only if there was an objection was the colloquy between the trial court and counsel placed on the record. The Court assumes that the prosecutor then challenged Ms. Benbow peremptorily; however, defense counsel did not articulate a *Batson* challenge as to Ms. Benbow specifically, but merely stated that she was "involved."  The trial court appeared to treat this mention of Ms. Benbow as a *Batson* challenge for it ruled that the prosecutor could challenge her peremptorily, relying, apparently, on the prosecutor's reason given in support of the for-cause challenge. Again, this Court notes the difficulties created by the failure of the trial court to make a complete record of the peremptory challenges.

It appears the only peremptories exercised by the prosecutor were the strikes discussed above against four out of the five Black jurors in round one, although the trial transcript is not entirely clear on this point; the attorneys apparently informed the trial court of their peremptory challenges off the record, and the trial court then addressed any *Batson* objections on the record. In any event, at the end of round one, there were eight jurors seated, two of whom were Black (*i.e.*, Ms. Jefferson, not challenged by the prosecution; and Mr. Barry, challenged by the prosecution, but overruled), and six of whom apparently were Caucasian. To summarize, of the Black jurors removed at this point, two had been removed for cause (Ms. Hayward and Ms. Dixon). Three Black jurors were removed through the prosecutor's use of peremptory strikes (Ms. Peters, Ms. Hanna, and Ms. Benbow). It appears that all of the prosecutor's peremptory strikes were exercised against Black jurors (four out of four strikes), although one strike was denied by the trial court (*i.e.*, Mr. Barry).

### 2.)   Round Two of Prospective Jurors

In round two, there were twenty-one prospective jurors, two of whom were Black (Ms. Seawright and Ms. Thompson), and nineteen of whom apparently were Caucasian. Both Ms. Seawright and Ms. Thompson informed the trial court that they had relatives who had been convicted of crimes. Ms. Thompson's brother had been convicted about a year and a half ago of an unnamed crime and sentenced to two to five years in prison. T.110. She stated that she was close to her brother, and that she had followed the case but had not attended the trial. T.110-11. When asked if she had any feelings about how her brother was treated in the criminal justice system that would affect her sitting as a juror, Ms. Thompson responded, "No." T.111.

Ms. Seawright stated that "[n]ot quite a year" ago, her nephew had been accused and

convicted of a crime (possession of a controlled substance). T/117-18. When asked if she were

close to her nephew, she replied, "Not really. I love him, he's my nephew, but he did the crime,

he got to pay the time." T.117. Based on Ms. Seawright's statements, the judge discerned that the

matter was still pending on appeal and the nephew was in prison. When asked if she had any

feelings about how her nephew was treated that would affect her sitting as a juror, Ms. Seawright

replied, "No, sir."

The prosecutor exercised peremptory challenges with respect to Ms. Thompson and Ms.

Seawright, the only two black jurors in the second panel. Defense counsel again raised a *Batson*

challenge:

| | |
|---|---|
| Mr. Kasperek: | Well, again, Judge, my position is Mrs. Thompson is the next available black female that we get on the list and we have this recurrent issue arising every time we come to the next available black candidate. |
| Mr. Curran: | Well, Judge - - |
| The Court: | Mr. Curran? |
| Mr. Curran: | I believe Ms. Thompson indicated her brother was convicted in the last year or so, is currently in state prison, she stated she was close with her brother. Clearly, that is a concern for the People. |
| Mr. Kasperek: | She also said that she felt the system acted fairly and that he was fairly treated and there was no inquiry to indicate that she would have any animosity toward the District Attorney's Office or the system for that [sic] she could be, you know, that she would be anything but fair regarding the process. |
| The Court: | The Court - - |
| Mr. Kasperek: | I would submit to you, Judge, we hear these same recurrent situations from the People regarding these issues and it's obvious that these issues don't come up for white jurors. |
| The Court: | The Court is satisfied by the explanation and will permit the People to exercise a peremptory. |
| . . . | |
| (There was a discussion off the record.) | |
| Mr. Curran: | Number 12, let me just address why. |

| | |
|---|---|
| Mr. Kasperek: | I have to raise the challenge, first. And we are at the next black potential juror and we now have this same issue, Judge. My application continues and if this is not a pattern, nothing is. |
| The Court: | All right. Which juror? |
| Mr. Kasperek: | That would be Miss Seawright, Judge, No. 12. |
| Mr. Curran: | Judge, Miss Seawright indicated her nephew was convicted about a year ago of a drug charge. She believes the case is even still pending at this point in some form. He is currently in prison. Again, she says that she was - - loves her nephew very much and, again, it's the same difficulties. |
| The Court: | The Court will permit the peremptory challenge, with that explanation. |

T.147-48. Thus, the prosecutor was permitted to use peremptory strikes to exclude the only two

Black jurors in the second panel. By the end of the second round, twelve jurors (two Blacks and

ten Caucasians) and two alternate jurors (two Caucasians) had been selected.

### c.    Adjudication on the Merits by the State Appellate Court

On direct appeal, the Appellate Division dismissed Jones' *Batson* claim on the merits,

holding as follows:

> Defendant further contends that the court erred in denying his *Batson* challenges with respect to five prospective jurors. The court properly determined that the explanations offered by the People for their peremptory challenges with respect to four of those prospective jurors were race-neutral and not pretextual. The court "was in the best position to observe the prosecutor's demeanor", and its denial of defendant's challenges with respect to those prospective jurors is entitled to great deference[.] With respect to the remaining prospective juror, the court properly determined that defendant failed to establish the existence of "facts and other relevant circumstances sufficient to raise an inference that the prosecution used its peremptory challenges to exclude potential jurors because of their race" and thus failed to meet his burden of presenting a prima facie case of discrimination[.]

*People v. Jones*, 289 A.D.2d at 963 (citations omitted). The "four jurors" whom the Appellate

Division lumps together, without naming, are Ms. Benbow, Ms. Hanna, Ms. Thompson, and Ms.

-19-

Seawright. With respect to these jurors, the trial court either found that the defense had articulated a *prima facie* case and requested that the prosecutor respond to the *Batson* challenge, or the prosecutor went ahead, without being asked, and articulated a race-neutral reason for exercising the peremptory strike. As to the remaining unnamed juror, the Appellate Division apparently agreed with the trial court's finding that Jones failed to make out a *prima facie* case under *Batson*. Based on the Court's review of the *voir dire* transcript, the fifth juror is most likely Ms. Peters, the one juror for whom the trial court did not ask the prosecutor to articulate a race-neutral reason for the peremptory strike.

In *Overton v. Newton*, the Second Circuit clarified that the determination of whether a prima facie case of discriminatory use of a peremptory has been established is a mixed question of fact and law subject to the standard set forth in 28 U.S.C. § 2254(d)(1). *Overton*, 295 F.3d at 277. Thus, in order to grant petitioner a writ of habeas corpus, this Court must determine whether the state courts unreasonably applied, *see* 28 U.S.C. § 2254(d)(1)(A), the standard set forth in *Batson* in (1) finding that Jones failed to carry his burden of showing by a preponderance of the evidence that the peremptory challenges with respect to Ms. Thompson, Ms. Seawright, Ms. Benbow, and Ms. Hanna were based on race, and (2) finding that Jones had not made out a *prima facie* case with regard to Ms. Peters. *See Harris*, 346 F.3d at 343; *Overton*, 295 F.3d at 277.

### d.    Analysis of claim regarding Ms. Peters – failure to establish *prima facie* case

Neither the Supreme Court nor the Second Circuit has outlined with definition which factors or circumstances the trial court should consider when determining whether the party raising a *Batson* challenge has made a *prima facie* showing of discrimination in the use of peremptory challenges. *Overton*, 295 F.3d at 278. In *Batson*, the Supreme Court did not set a

precise threshold to govern when a *prima facie* case has been established but rather directed trial

courts to examine "all relevant circumstances" in deciding when a *prima facie* case had been

established. The Supreme Court observed that the "total or seriously disproportionate exclusion"

of members of a racial group from a jury venire or a "pattern" of strikes against black jurors

included in the particular *venire* might give rise to an inference of discrimination; in addition, the

non-moving party's questions and statements during *voir dire* examination and in exercising his

challenges might support or refute an inference of discriminatory purpose. *Batson*, 476 U.S. at

93-94, 96-97; *see also Johnson v. California*, 545 U.S. 162, 125 S.Ct. 2410, 2417, 162 L.Ed.2d

129 (2005) (holding that a *prima facie* case under *Batson* only requires "evidence sufficient to

permit the trial judge to draw an inference that discrimination has occurred"); *accord Tankleff v.

Senkowski*, 135 F.3d 235, 249 (2d Cir. 1998) (stating that "courts should consider how many

members of the cognizable racial group are in the venire panel from which the petit jury is

chosen, the pattern of strikes against racial group jurors in the particular venire, the prosecutor's

statements and questions during selection, as well as any other relevant circumstances"; so

holding in the context of a challenge under *Powers v. Ohio*, 499 U.S. 400, 415 (1991), which

held that a defendant may raise a *Batson* challenge whether or not the defendant and the excluded

jurors share the same race); *Overton*, 295 F.3d at 277-78. *Batson* makes clear, however, that the

examples listed are "merely illustrative." *Batson*, 476 U.S. at 97; *Overton*, 295 F.3d at 278

("Other than through these illustrative examples, the [Supreme] Court has not, to date, provided a

more particularized view of what constitutes a *prima facie* showing of discrimination under

*Batson*.") The Second Circuit has observed that "[c]ourts have used a . . . multi-factor analysis in

analyzing *prima facie* showings under *Batson*," which requires an examination of "the totality of

-21-

the circumstances." *Harris*, 346 F.3d at 345 (citations omitted).

After examining the statistics revealed by the available *voir dire* record, the Court notes the prosecutor did not strike all of the Black jurors and apparently did not challenge the seating of one black juror, Ms. Jefferson. Based on what this Court can glean from the *voir dire* transcript, it appears that there were forty-two potential jurors. Nine of those jurors were identified as being Black. The prosecutor challenged seven out of the nine Black jurors by means of six peremptory challenges and one for-cause challenge; defense counsel challenged one Black juror for-cause. It appears that the prosecution's peremptory minority challenge rate was four peremptories in the first round (Ms. Benbow, Ms. Hannah, Mr. Barry, and Ms. Peters).[6]   In the second round, the prosecutor exercised two peremptories against the only two Black jurors in the panel. It appears, although it is difficult to say for certain, that these were the only two peremptories used by the prosecutor in this round. The Court discerns that, by the end of jury selection, the prosecutor had used six of his available fifteen peremptory challenges[7] against Black jurors. The minority challenge rate is calculated using the total number of peremptory strikes available, not the number of strikes actually used by the prosecutor.[8] *See United States v. Alvarado*, 891 F.2d 439, 444 (2d

---

[6]      Before beginning the second round, the trial court asked, "[T]hat makes how many challenges for Mr. Curran [the prosecutor] in this round?" T.95. Defense counsel responded "[t]hree on this round," which appears to take into consideration the fact that one of the peremptory challenges (to Mr. Barry) was denied. It is clear, however, that the prosecutor actually used four peremptories, not three.

[7]      Although the prosecutor only exercised a total of six peremptory challenges, New York law entitled him to fifteen such challenges. *See* N.Y. Crim. Proc. Law § 270.25(2)(b).

[8]      In *Alvarado I*, the Second Circuit found that the prosecutor had six (6) total peremptories available to challenge regular jurors, and one (1) peremptory available to use during the selection of the alternate jurors. Hence, the Second Circuit calculated the total available peremptory challenges as seven (7). *See Alvarado*, 891 F.2d at 440, 444; Fed. R. Crim. P. 24(b), (c). The Second Circuit rejected defendant's calculation of the peremptory challenge rate against minorities as 67 percent (four of six challenges used were against minorities) in favor of a calculation taking waived challenges into account. The Second Circuit thus observed that "since the prosecutor waived one challenge at a point where minority venire members were available for challenge, it is more

Cir. 1989) ("*Alvarado I*"), *vacated on other grounds*, 497 U.S. 543, 110 S.Ct. 2995, 111 L.Ed.2d 439 (1990); *Barbara v. Goord*, 2001 WL 1776159, *3; n.2  ("In nine rounds of jury challenges, the prosecution exercised nine of its fifteen available challenges, or 60% against black jurors. . . . Although the prosecutor only exercised a total of eleven peremptory challenges, N.Y. Crim. Proc. Law § 270.25(2)(b) (McKinney 1993) entitled him to fifteen challenges. In *United States v. Alvarado*, 891 F.2d [at] 444 . . . , the Second Circuit ruled that a prosecutor's percentage of minority challenges should be calculated by considering waived as well as exercised challenges"). In Jones' case, therefore, one obtains a minority challenge rate of 40% (six peremptory challenges used against Blacks out of fifteen available peremptories). Absent discriminatory intent, a prosecutor would be expected to exercise peremptory challenges against minority jurors in roughly the same percentage as their representation in the venire; "[o]nly a rate of minority challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination." *United States v. Alvarado*, 923 F.2d 253, 255 (2d Cir. 1991) ("*Alvarado II*"). Where a challenge rate is "significantly higher" than the minority percentage of the venire, statistics alone can "strongly support[ ]" a *prima facie* claim of discrimination. *Id.* at 255-56 (concluding that a prosecutor's use of 50% of its peremptory challenges against minority members who composed approximately 29% of the venire evidenced prima facie discrimination; "We think a challenge rate nearly twice the likely minority percentage of the venire strongly supports a *prima facie* case under *Batson*.") *see also Tankleff v. Senkowski*,

---

pertinent to note that the challenge rate was 57 percent (four of seven) against all venire members and 50 percent (three of six) in the selection of the jury of twelve prior to the selection of alternates." *Id. Accord, e.g., Barbara v. Goord*, No. 98-4569, 2001 WL 1776159, at *3 n. 2 (E.D.N.Y. Dec. 27, 2001) ("noting that the Second Circuit has ruled that waived challenges should be included in calculating the percentage of minority challenges); *Harrison v. Ricks*, 326 F. Supp.2d 372, 378 (E.D.N.Y. 2004).

135 F.3d at 249 (holding that fact that the government tried to strike the only three blacks who were on the panel constituted a "sufficiently dramatic pattern of actions" to make out a *prima facie* case) (citing, *inter alia*, *see McCain v. Gramley*, 96 F.3d at 292 ("[W]here there are only a few members of a racial group on the venire panel and one party strikes each one of them," the inference of discrimination may arise).

Looking at the foregoing statistics in context, one can discern that the minority challenge rate of 40% was nearly twice the percentage of minorities comprising the jury venire (21.4%). Thus, there was a substantial statistical disparity in the percentage of peremptory strikes against Blacks compared to the percentage of Blacks comprising the venire, and the prosecutor apparently only used its peremptory strikes against minority jurors–the confluence of these factors certainly would seem to satisfy a minimal standard.  *See Anderson v. Ricks*, 360 F. Supp.2d 477, 494-95 (E.D.N.Y. 2005). After all, the Second Circuit has described the defendant's *prima facie* burden to be "minimal" and "similar to that placed on plaintiffs in Title VII and equal protection jurisprudence." *Overton*, 295 F.3d at 279 n. 10. Despite the minimal showing needed to satisfy the *prima facie* burden, the circuit courts, including the Second Circuit, have only twice granted habeas challenges under the unreasonable-application prong of AEDPA when a trial court has failed to find a *prima facie* case and implement the second prong of *Batson*. *See id.* at 495 (comparing *Harris*, 346 F.3d at 346 (granting habeas where prosecutor used peremptories against all five blacks in the venire) and *Brinson v. Vaughn,* 398 F.3d 225, 232 (3d Cir. 2005) (granting habeas where prosecutor used thirteen of fourteen peremptories against blacks) with *Overton*, 295 F.3d at 279 (denying habeas when prosecutor struck seven of ten qualified blacks in the first two rounds, including all five blacks in the second round)). These Second Circuit cases illustrate the

circuit's reluctance to grant habeas relief for violations occurring at the first *Batson* step except in the rarest of cases. Nevertheless, the Court is of the opinion that Jones might have had a meritorious *Batson* claim with regard to Ms. Peters, even under AEDPA's restrictive unreasonable-application standard, in large part because of the stark disparity in the pattern of strikes against black jurors compared to the pattern of strikes against white jurors. *See id.*

However, fatal to Jones' claim is the failure of defense counsel to articulate all the relevant facts and circumstances in support of the *Batson* challenge. This is the factor that tips the scale against finding "unreasonableness" in the state court's disposition of petitioner's *Batson* claim with respect to Ms. Peters–the stiff requirement placed on defense counsel to adequately develop the *voir dire* record so as to provide a context for evaluating statistics. *See Overton v. Newton*, 295 F.3d at 279-80.[9] In *Overton*, the district court had granted a writ of habeas corpus based on petitioner's *Batson* claim; the prosecutor in that case had exercised seven out of ten challenges against Black prospective jurors. In making the *Batson* claim, Overton's trial counsel merely noted that by her "rough count," the prosecutor had exercised seven of nine peremptory challenges against Blacks after the first two rounds of jury selection. *See Overton v. Newton*, 146 F. Supp.2d 267, 271 (E.D.N.Y. 2001), *rev'd*, *Overton*, 295 F.3d at 279.[10] The trial judge rejected the claim summarily. Later that day, the judge identified the races of the members of the first two panels and

---

[9]     *Batson* sets forth a broad principle that purposeful exclusion of jurors on the basis of race violates the Equal Protection Clause of the U.S. Constitution. *Overton*, 295 F.3d at 278.  Accordingly, the Second Circuit concluded, "statistics, alone and without more, can, in appropriate circumstances, be sufficient to establish the requisite prima facie showing under *Batson* . . . . [T]o hold otherwise would undermine the general antidiscrimination principle established by *Batson*." *Id.* at 278-79.

[10]     The *Batson* challenge in *Overton* was raised at the end of the second round of jurors; by that time, 70 percent of Black potential jurors (seven of ten challenges, not nine, as defense counsel thought) had been challenged, including all five Black persons in the second round. This amounted to more than twice the 34% of Black individuals comprising the thirty-two venirepersons whose races were known. *See Overton v. Newton*, 146 F. Supp.2d at 271-72.

whether each had been excused for cause, struck by use of a peremptory challenge, or seated as a juror. *Id.* However, the *Batson* claim, which had been made before the racial make-up of the two panels had been established on the record and before jury selection was complete, was never renewed. *Overton*, 295 F.3d at 279. Noting that petitioner "[bears] the burden of articulating and developing the factual and legal grounds supporting his *Batson* challenge before the trial court," the Second Circuit held that "[b]ecause this was not done, the trial judge never confronted, and the trial record does not reveal, what the statistics would have shown at the conclusion of jury selection." The circuit court went on to note that if those statistics "sufficiently established the inference" that the prosecutor's challenges were based on race, the trial judge "could then have implemented the *Batson* process to ensure that impermissible challenges were not allowed." *Id.* Applying the AEDPA "unreasonable application" standard, the Second Circuit held that "on th[e] record, the trial judge's refusal to implement *Batson*'s process for testing each questioned challenge midway in the process was [not] an unreasonable application of the *Batson* requirements." *Id.* at 280.

Here, defense counsel reiterated his challenge to Ms. Peters once during the first round of jurors; however, he did not renew it during the second round of jury selection or after jury selection had been completed. Moreover, defense counsel failed to articulate and develop the relevant information to place the number of peremptory challenges exercised against Blacks in a meaningful context. When raising the issue the second time regarding Ms. Peters, defense counsel did not mention statistics; rather, he argued that Ms. Peters had "none of the characteristics" which the prosecutor had articulated as being cause for concern (*e.g.*, personal knowledge of a friend of the defendant, having a close relative who had been convicted of a crime). While this is a

relevant consideration, it was insufficient to comply with the requirements of *Overton*. When

defense counsel raised his *Batson* challenge in the second round, with regard to Ms. Seawright

and Ms. Thompson, he merely said, "[W]e have this recurrent issue arising every time we come to

the next available black candidate." T.145-46. *Cf. Harrison v. Ricks*, 326 F. Supp.2d at 380

(holding that defense counsel failed to adequately develop the record pursuant to *Overton* where

she merely stated that the prosecutor had exercised four out of five peremptory challenges against

African-Americans). Defense counsel said that it was "obvious" that the same issues "don't come

up for white jurors" but failed to articulate the pertinent statistics. It is true that the relevant

statistical information can be extrapolated from the *voir dire* transcript, but defense counsel

missed the opportunity to support his claim by making a complete record before the trial judge of,

for instance, the total racial composition of the panels (21.4% of the jurors were black); the fact

that the prosecutor peremptorily challenged six out of the nine Black jurors (66.7%); and the fact

that at the time the issue of Ms. Peters was raised a second time, the prosecutor had exercised six

of his available peremptories, all of which appeared to be against Black jurors. The Court notes

that defense counsel cogently developed the argument that there was no reason for the challenge

to Ms. Peters other than race. However, because the statistical component of the *Batson* claim was

not well developed, the trial court was not presented with a "complete picture." Moreover,

defense counsel missed the opportunity to argue that the failed peremptory challenge of Mr. Barry

could be considered circumstantial evidence of the prosecutor's improper motive in challenging

Ms. Peters and, for that matter, all black jurors. For all of these reason*s*, and in light of the

deferential standard under which it must operate, the Court is reluctantly compelled to conclude

that the trial court was not objectively unreasonable in failing to implement the *Batson* process

with respect to Ms. Peters.[11] *See Harrison v. Ricks*, 326 F. Supp.2d at 380 (rejecting a *Batson*

claim--despite it being renewed after jury selection--due to defense counsel's failure to articulate

and develop the relevant statistical information to place the number of peremptory challenges

exercised against potential Black jurors in a "meaningful context"), *aff'd mem.*, No. 04-4837-PR,

150 Fed. Appx. 95 (2d Cir. 2005); *Williams v. Burge*, No. 04 CIV. 2590 (PKC), 2005 WL

2429445, at *6 (S.D.N.Y. Oct. 3, 2005); *Rodriguez v. Greiner*, 2004 WL 2781720, at *6-*7

(S.D.N.Y. Dec. 3, 2004) (rejecting a *Batson* claim based on a state court conviction because

petitioner failed to "fully establish the trial record" by renewing his *Batson* claim after jury

selection); *Overton*, 295 F.3d at 279 (denying habeas when prosecutor struck seven of ten

qualified blacks in the first two rounds, including all five blacks in the second round).

    Nevertheless, the Court grants a Certificate of Appealability; Jones has made a

"substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2)

because the question of whether he has sufficiently articulated a prima facie case under *Batson* is

"adequate to deserve encouragement to proceed further." *See Lucidore v. New York State Div. of*

*Parole*, 209 F.3d 107, 112 (2d Cir. 2000) ("[A] 'substantial showing' does not compel a petitioner

to demonstrate that he would prevail on the merits, but merely . . . that the questions are adequate

to deserve encouragement to proceed further.") (citations and quotations omitted; alterations in

original)); *accord Anderson v. Superintendent, Elmira Corr. Fac.*, 360 F. Supp.2d at 496 (finding

that petitioner had articulated meritorious *prima facie* case under Batson; denying habeas relief

under AEDPA because trial court's refusal to find *prima facie* case not unreasonable given the

---

[11]    The Court acknowledges that trial counsel tenaciously represented petitioner's interests in asserting the *Batson* challenges.  It is only the stringent requirements of *Overton v. Newton*, 295 F.3d at 279-80, that preclude this Court from granting Jones' petition as to the *Batson* challenge regarding Ms. Peters.

failure of defense counsel to fulfill his evidentiary burden, but granting a certificate of appealability).

**e.** ***Batson* challenges with regard to remaining four jurors**

Because the prosecutor turned to the second step of *Batson* by offering reasons for striking Ms. Hanna, Ms. Benbow, Ms. Seawright, and Ms. Thompson as soon as defense counsel raised a challenge with regard to them, *Batson*'s step one is not at issue here. *See Hernandez*, 500 U.S. at 359. "The Supreme Court has held that the *prima facie* case of discriminatory intent becomes irrelevant to the analysis of a peremptory challenge once the trial court proceeds to the second and third steps as it did here." *McKinney v. Artuz*, 326 F.3d 87, 98 (2d Cir. 2003) (citing *Hernandez*, 500 U.S. at 359) ("Once [the nonmoving party] has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the [moving party] had made a *prima facie* showing becomes moot.").[12]

At the second *Batson* step, the prosecutor may not simply deny that he had a discriminatory motive or affirm his good faith. *Batson*, 476 U.S. at 97. Rather, he must "articulate a neutral explanation related to the particular case to be tried." *Id.* at 98. As the Supreme Court later held, the explanation need not be "persuasive, or even plausible," and may even be silly or superstitious, provided that it does not deny equal protection on its face. *Purkett v. Elem*, 514 U.S. at 768. The reasons proffered by the prosecutor were all facially neutral; he stated that he struck

---

[12]          Indeed, the trial judge never explicitly said anything with regard to whether a *prima facie* case of discrimination had been established at the time defense counsel challenged Ms. Hanna, Ms. Benbow and Mr. Barry in the first round and Ms. Seawright and Ms. Thompson in the second round. At most, after defense counsel would raise his challenge, the trial judge would turn to the prosecutor and say, "Mr. Curran?" In fact, with respect to Ms. Seawright, the prosecutor started giving a race-neutral reason for striking her before defense counsel even raised a *Batson* challenge. *See* T.147.

Ms. Hanna, Ms. Seawright, and Ms. Thompson because each had a close relative who had been

convicted of a crime, and that he struck Ms. Benbow because she knew, on a personal level, a

friend of the petitioner's.

At the third and final step, the trial court is called upon to determine whether the opponent

of the strike has carried his burden of proving "purposeful discrimination." *Batson*, 476 U.S. at

98. At this step, the trial court's analysis will  focus on the credibility of the attorney exercising

the peremptory challenge. *Hernandez v. New York*, 500 U.S. 352, 365, 111 S.Ct. 1859, 114

L.Ed.2d 395 (1991) ("In the typical peremptory challenge inquiry, the decisive question will be

whether counsel's race-neutral explanation for a peremptory challenge should be believed."). *See*

*also Galarza v. Keane*, 252 F.3d 630, 636 (2d Cir. 2001) ("[A] trial court may not deny a *Batson*

motion without determining whether it credits the race-neutral explanations for the challenged

peremptory strikes."); *Jordan v. Lefevre*, 206 F.3d 196, 200 (2d Cir. 2000) ("[T]he third step of

the *Batson* inquiry requires a trial judge to make an ultimate determination on the issue of

discriminatory intent based on all the facts and circumstances.").

With regard to Ms. Hanna and Ms. Benbow, the trial judge said, "I shall permit the

peremptory challenge," citing Ms. Benbow's "relationship to a close friend of to a friend of the

Defendant" and Ms. Hanna's indication that she had "family members [who] had been involved

with the criminal justice system[.]" T.95.  There is no doubt–and Jones has not attempted to argue

otherwise–that the trial judge credited the race-neutral explanations proffered by the prosecution

to defend its strikes against these four jurors. Although the trial judge did not render that

conclusion *in haec verba*, he is not required to do so. *See Galarza v. Keane*, 252 F.3d at 640 n. 10

("Our holding should not be read, however, as requiring a talismanic recitation of specific words

in order to satisfy *Batson*. This may well have been a different case if the trial court's review of Galarza's *Batson* challenges culminated in a general crediting of the prosecutor's race-neutral explanations or possibly even if the trial court had merely stated that it rejected each of Galarza's *Batson* claims."); *see also Miller-El v. Cockrell*, 537 U.S. 322, 347, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) ("We adhere to the proposition that a state court need not make detailed findings addressing all the evidence before it" in addressing a *Batson* challenge.).

The trial court's determination of purposeful discrimination is a factual finding that is entitled to appropriate deference by a reviewing court. *See Batson*, 476 U.S. at 98 n. 21 (citing *Anderson v. Bessemer City*, 470 U.S. 564, 570, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (Title VII finding of intentional discrimination is a factual finding entitled to deference)). "It is not until the third step that the persuasiveness of the justification becomes relevant--the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination." *Purkett*, 514 U.S. at 768.  The task of assessing the prosecutor's proffered race-neutral explanations so as to determine the ultimate issue of whether discrimination has been shown "falls primarily upon the judicial officer conducting the jury selection, whose determinations as to credibility of the proffered explanations are entitled to 'appropriate deference'. . . ." *United States v. Alvarado*, 951 F.2d 22, 25 (2d Cir. 1991) (quoting *Batson*, 476 U.S. at 98 n. 21). "When circumstances suggest the need, the trial court must undertake a 'factual inquiry' that 'takes into account all possible explanatory factors' in the particular case." *Batson*, 476 U.S. at 95 (quoting *Alexander v. Louisiana*, 405 U.S. 625, 630, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972)). Under AEDPA's standards for reviewing factual determinations, Jones has the burden of showing that (1) the state court's finding regarding the credibility of the prosecutor's

explanation was incorrect by clear and convincing evidence; and (2) the corresponding finding was unreasonable given the evidence presented. *See Miller-El*, 537 U.S. at 348.

With respect to the three jurors who were struck because they had relatives or family members who had been involved with the criminal justice system (Ms. Hanna, Ms. Thompson, and Ms. Seawright),[13] defense counsel argued that the prosecutor's discriminatory motive was evidenced by the fact that he did not strike Mr. Paradise, a white male whose son had been charged with and convicted of a crime. Jones' attorney challenged the prosecutor's explanation for these strikes, arguing that the facially race-neutral explanation proffered by the prosecutor was pretextual because a non-black venireperson who also had a relative in prison was not struck from the jury pool. The uneven application of a facially race neutral explanation does not, by itself, necessarily establish the invalidity of the explanation. *Owens v. Portuondo*, 1999 WL 378343, *11 (citing *Matthews v. Evatt*, 105 F.3d 907, 918 (4th Cir.) ("*Batson* is not violated whenever two veniremen of different races provide the same responses and one is excused and the other is not . . . because counsel must be entitled to make credibility determinations in exercising peremptory challenges."), *cert. denied*, 118 S.Ct. 102 (1997); *United States v. Spriggs*, 102 F.3d 1245, 1255 (D.C. Cir.), *cert. denied*, 118 S.Ct. 97 (1997); *United States v. Stewart*, 65 F.3d 918, 926 (11th Cir.

---

[13]       "A family member's criminal history has been found to constitute a race-neutral factor for a peremptory challenge of a prospective juror." *Owens v. Portuondo*, No. 98 CIV. 6559(AJP), 1999 WL 378343, at *10 (S.D.N.Y. Jun. 9, 1999) (citing *United States v. Lawal*, No. 97-1026, 129 F.3d 114 (table), 1997 WL 664794 at *1 (2d Cir. Oct. 21, 1997) (stating that challenges "on the basis of family criminal histories . . . are well-accepted, facially race-neutral reasons"); *United States v. Wiggins*, 104 F.3d 174, 176 (8th Cir. 1997) ("[T]his court has held that 'the incarceration of a close family member is a legitimate race-neutral reason justifying the use of a "peremptory strike[.]"'"); *United States v. Mathis*, 96 F.3d 1577, 1582 (11th Cir. 1996) ("The record shows that [the potential juror], who is Hispanic, was removed because a close family member of hers had had a cocaine conviction. There was no clear error in allowing the strike. . . . "), *cert. denied*, 520 U.S. 1213, 117 S.Ct. 1699 (1997); *United States v. Casper*, 956 F.2d 416, 419 (3d Cir. 1992); *United States v. Johnson*, 941 F.2d 1102, 1109 n. 4 (10th Cir. 1991); *United States v. Forbes*, 816 F.2d 1006, 1010 (5th Cir. 1987); *Jordan v. LeFevre*, 22 F. Supp.2d at 272; *United States v. Franklyn*, No. S1 96 Cr. 1062, 1997 WL 334969 at *5-6 (S.D.N.Y. 1997), *aff'd*, 157 F.3d 90 (2d Cir. 1998)).

1995) ("We recognize that failing to strike a white juror who shares some traits with a struck black juror does not itself automatically prove the existence of discrimination."), *cert. denied*, 516 U.S. 1134, 116 S.Ct. 958 (1996); *United States v. Alvarado*, 951 F.2d at 25 ("Decisions in other circuits have observed that an explanation for a peremptory challenge, though weakened, is not automatically to be rejected simply because it applies to a non-minority venireperson who was not challenged.")). Rather, "[t]he force of a prosecutor's explanation for challenging a minority member of a venire is obviously weakened substantially by evidence that non-minority members to whom the same explanation applies were not challenged." *United States v. Alvarado*, 951 F.2d at 25; *accord, e.g., Davidson v. Harris*, 30 F.3d 963, 965 (8th Cir. 1994) ("'In this circuit, it is well established that [a litigant] may not justify peremptory challenges to venire members of one race unless venire members of another race with comparable or similar characteristics are also challenged.' . . . A party can establish an otherwise neutral explanation is pretextual by showing that the characteristics of a stricken black panel member are shared by white panel members who were not stricken."), *cert. denied*, 513 U.S. 1083, 115 S.Ct. 737 (1995); *United States v. Alvarado*, 923 F.2d 253, 256 (2d Cir.1991) ("*Alvarado II*") ("The relative plausibility or implausibility of each explanation for a particular challenge assessed in light of the prosecution's acceptance of jurors with similar circumstances, may strengthen or weaken the assessment of the prosecution's explanation as to other challenges and thereby assist the fact-finder in determining overall intent."); *Roman v. Abrams*, 822 F.2d 214, 228 (2d Cir.1987) (upholding district court's finding that prosecutor's reasons for striking jurors were pretextual where, *inter alia*, they were only exercised against white jurors with that characteristic but not against non-white jurors with similar characteristic), *cert. denied*, 489 U.S. 1052, 109 S.Ct. 1311 (1989).

Turning first to Ms. Hanna, the Court observes that the prosecutor's stated reason for striking her was well supported by the record. Ms. Hanna stated during *voir dire* that she and her son had been victims of a crime. T.49 ("I been having problems in my neighborhood, people just coming by, throwing bricks to my window in the middle of the night and I'm sitting on the couch. And my son, about two years ago I guess he was driving an unregistered car and he got stopped, he ran and he got beat up [by the police]."). Ms. Hanna stated that her nephew had been convicted of "dealing in controlled substance." T.49. When asked whether any of those factors would affect her ability to be impartial, Ms. Hanna replied that "[o]n the police department, I do feel I was – I wasn't dealt with. I even went as far as calling the Mayor's office." *Id.* However, Ms. Hanna stated that she would not hold anything against any Rochester police officers who might testify at Jones' trial. T.50. Ms. Hanna's statement that she felt that she was not treated fairly by the police department is significant, since the prosecutor knew that members of the same police department would be testifying as the state's witnesses at trial. Moreover, it materially distinguishes her from Mr. Paradise, who testified that his son was convicted ten or twelve years ago of crime that was not similar to the crime at issue and when asked if he had any feelings about how that case was handled that would affect his sitting as a juror replied, "None whatsoever." The Court finds that any inference of discrimination based on the shared characteristic is significantly undermined by this key difference between the jurors. Thus, as to Ms. Hanna, the Court finds that Jones has not rebutted the presumption of correctness that must be accorded to the trial court's factual finding regarding the credibility of the prosecutor's reason for dismissing her.

The Court turns next to Ms. Seawright, whose nephew recently had been convicted of a drug crime, and whose appeal was still pending at the time of jury selection for Jones' trial, and

Ms. Thompson, whose brother had been convicted of an unnamed crime about a year and a half

previously. Ms. Thompson stated that she was "close" to her brother and that she followed the

trial but did not attend the proceedings. T.110-11. Ms. Seawright said that she had visited her

nephew at Wende Correctional Facility. T.128. When asked if she were close to her nephew, she

replied, "Not really. I love him, he's my nephew, but he did the crime, he got to pay the time."

T.117. Both Ms. Thompson and Ms. Seawright affirmed that they harbored no feelings as a result

of their relatives' convictions that would affect their sitting as jurors. Neither Ms. Thompson nor

Ms. Seawright gave an indication that their family members were treated unfairly by the police or

the courts. However, one fairly significant difference is that Mr. Paradise's son's conviction

occurred over a decade previously, while Ms. Seawright's nephew's criminal appeal was still

pending, and Ms. Thompson's brother was convicted about a year previously and was still in

prison. Ms. Thompson also said that she was "close" to her brother and had followed the trial.

Mindful of the deference it must accord the trial court's credibility determination in the *Batson*

context, the Court concludes that any inferences favorable to Jones are undermined by these

differences between the jurors' situations. *See United States v. Valley*, 928 F.2d 130, 136 (5th Cir.

1991) (finding prosecutor's explanation for striking black jurors, family member's criminal

history, was not pretextual even though it applied to white jurors who were not struck, where there

were "race-neutral differences" between struck and not struck jurors); *United States v. Lance*, 853

F.2d 1177, 1181 (5th Cir. 1988) ("Although the prosecutor may have accepted a white juror with

some characteristics similar to the black persons he rejected, the prosecutor also gave reasons for

his selection that we are unable to evaluate, such as eye contact and demeanor."); *United States v.*

*McCoy*, 848 F.2d 743, 745 (6th Cir. 1988) (finding that "[a]lthough three white jurors who were

not challenged also did not work, the prosecution could reasonably assume that they, a 63-year-old male, a 62-year-old male, and a 41-year-old married female, would not excessively sympathize with [defendant]" unlike the young black female unemployed juror who was struck); *United States v. Lewis*, 837 F.2d 415, 417 n. 5 (9th Cir. 1988) ("We recognize, however, that the decision whether to strike a venireman hinges upon the interplay of various factors and that no unchallenged juror possessed all the cited characteristics."). Whether the prosecutor's explanations as to Ms. Thompson and Ms. Seawright were credible is precisely the sort of assessment that a trial court is in far superior position than an appellate (or habeas) court to make. *See Miller-El v. Cockrell*, 537 U.S. at 339 (stating that the trial judge can measure the credibility of a prosecutor's race-neutral explanations by reference to several factors, including its personal observations of the juror and of "the prosecutor's demeanor; by how reasonable, or how improbable the explanations are, and by whether the proffered rationale has some basis in accepted trial strategy").

Finally, with respect to Ms. Benbow, the Court notes that the record is not entirely clear as to if and when the prosecutor made a peremptory challenge; defense counsel did not initially make a *Batson* challenge with respect to her; when he was discussing the prosecutor's reasons for peremptorily striking Ms. Hanna and Mr. Barry, he stated that Ms. Benbow was "involved" and then proceeding to discuss why she should not be removed. It appears from the transcript that the prosecutor had just previously challenged Ms. Benbow for cause on the basis that she knew a friend of the petitioner's; this challenge for cause had been denied. When it ruled on defense counsel's *Batson* challenges, the trial court included Ms. Benbow its ruling, and pointed to the reason previously given by the prosecutor in attempting to use a for-cause challenge against

her–namely, that she knew a friend of the petitioner's named Tanya, had seen her outside the courtroom, and had hugged her. Ms. Benbow also had said that her son had been "wrongfully accused" of domestic violence, that she had been to Groveland Correctional Facility doing volunteer work, and that she might "get angry" during trial because she would not be allowed to say anything. T.21-32, 46, 61, 81. The Court notes that defense counsel did not make any argument concerning the circumstances of Ms. Benbow's departure from the jury, beyond noting that the prosecutor's for-cause challenge as to her had been denied, and that "he offered no contentions regarding her for her removal [sic][.]" Defense counsel stated that because the prosecutor "hasn't offered any explanation regarding [counsel's] challenge, it appears . . . that the Court [wa]s obligated to find that there are no challenges and that she should be seated. Moreover, it does not appears that there were any white jurors similarly situated to Ms. Benbow whom the prosecutor allowed to remain on the jury. Finally, the Court observes that a race-neutral reason behind a peremptory challenge does not have to rise to the level of a for-cause challenge. Here, the prosecutor's reason offered in his challenge for cause was supported by the record and supported the peremptory challenge made by the prosecutor after his challenge for cause was denied.  Jones has not articulated any basis for finding pretext with respect to this juror.

Both the trial court and the Appellate Division concluded that the prosecutor's reasons for striking Ms. Hannah, Ms. Benbow, Ms. Seawright and Ms. Thompson were race-neutral and not pretextual. As the proffered reasons find support in the voir dire transcript, and Jones has not articulated a basis for disturbing the state courts' factual findings that the prosecutor did not act with discriminatory purpose in striking these jurors, the Court cannot grant habeas relief on this aspect of Jones' *Batson* claim.

### 3.     Erroneous admission of in-court identifications

Jones asserts that the victims' in-court identifications of him as the robber "should have been found to be inadmissible because they were the result of suggestive show-up procedures with no independent basis for an in-court identification." Petition, ¶22(C) (Docket No. 1). Following the suppression hearing, the trial court denied defense counsel's motion to suppress the show-up identifications, holding that the "show-up was conducted properly and was not unduly suggestive. The two witnesses viewed the defendant separately, and they did not have any opportunity to compare or discuss their respective observations during the show-up proceedings. . . ." May 22, 1997 Supreme Court Order, Respondent's Exhibit E at p. 191. On direct appeal, the Appellate Division summarily dismissed this claim as "without merit." *People v. Jones*, 289 A.D.2d at 963.

A criminal defendant has the right under the Due Process Clause of the Constitution to be free from suggestive identification procedures that create a "very substantial likelihood of irreparable misidentification." *E.g.*, *Manson v. Brathwaite*, 432 U.S. 98, 116, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).  The first prong of the test for determining admissibility of a pre-trial identification inquires into whether the identification procedure was unnecessarily suggestive. *E.g.*, *Manson*, 432 U.S. at 114; *accord Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001) "'A major factor contributing to the high incidence of miscarriage of justice from mistaken identification has been the degree of suggestion inherent in the manner in which the prosecution presents the suspect to witnesses for pretrial identification.'" *Raheem*, 257 F.3d at 133 (quoting *United States v. Wade*, 388 U.S. 218, 228, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967)). The practice of showing a suspect singly to a witness for the purpose of identification shortly after a crime—commonly known as a "show-up"—is not inherently unconstitutional.  However, as the

Supreme Court noted in *Stovall v. Denno*, the "show-up," or "[t]he practice of showing suspects

singly to persons for the purpose of identification, and not as part of a lineup, has been widely

condemned." 388 U.S. 293, 302 (1967). A show-up, as opposed to a line-up or photo array, has

been described as "inherently suggestive" because the defendant is presented singly to the witness

by the police. *Brisco v. Phillips*, 376 F. Supp.2d 306, 313 (E.D.N.Y. 2005) (citing *Brodnicki v.*

*City of Omaha*, 75 F.3d 1261, 1265 (8th Cir. 1996)).

 Notwithstanding its inherent suggestiveness, the show-up procedure violates due process

only if it is the product of an "unnecessarily suggestive" procedure. *United States v. Bautista*, 23

F.3d 726, 729-30 (2d Cir. 1994). The existence of exigent circumstances weighs in favor of

finding that a show-up was not unnecessarily suggestive–such a procedure may be necessary to

quickly confirm the identity of a suspect. *See id.* at 729 (agreeing with defendant's statement that

"[a] prompt showing of a detained suspect at the scene of arrest has a very valid function: to

prevent the mistaken arrest of innocent persons"); *United States v. Valez*, 796 F.2d 24, 27 (2d Cir.

1986).  Thus, the Second Circuit has instructed that where an officer has "or should have doubts

whether a detained suspect is in fact the person sought, the officer must make 'immediate

reasonable efforts to confirm the suspect's identity.'" *Id.* (quoting *Valez*, 796 F.2d at 27). For this

reason, courts have admitted identification evidence from show-ups held in close temporal and

geographic proximity to the crime scene. *See*, *e.g.*, *United States ex rel. Cummings v. Zelker*, 455

F.2d 714, 716 (2d Cir. 1972) (holding that the show-up was necessary to insure "the immediate

release of an innocent suspect and at the same time enable the police to resume the search for the

fleeing culprit while the trail [was] still fresh"); *United States v. Butler*, 970 F.2d 1017, 1021 (2d

Cir. 1992).

In this case, the show-up was conducted within an hour after the robbery at the crime scene, factors that favor a finding that the police used a show-up out of reasonable necessity. Furthermore, the Court cannot find that there were actions by the police with respect to the handling of the witnesses which would have amplified the inherent suggestiveness of the show-up. For instance, the two witnesses were kept separated while they waited for the petitioner to be brought back to the scene, and were instructed privately regarding the identification procedure. Each witness viewed the petitioner while the other witness remained inside the store, unable to see the identification procedure. Nor did the witnesses have the opportunity to "compare notes" or discuss their respective observations during the show-up proceedings. This counsels in favor of finding that the show-up was not unduly suggestive. *Cf. United States ex rel. Smith v. Redman*, 414 F. Supp. 61, 63 (D. Del. 1976) ("Simultaneous viewing of one suspect by several witnesses should be avoided[.]") (citing *United States v. Wilson*, 435 F.2d 403, 405 (D.C. Cir. 1970) ("While the benefit of a prompt on-the-scene confrontation makes acceptable the necessary suggestiveness of presentation of a single subject (a 'showup'), there is ordinarily no need for the additional element of suggestiveness of identification made at the same time by two or more witnesses in each other's company.")).

As to the police officer's actions with respect to the petitioner, the Court notes that they walked him to the location of the show-up from a police car parked some distance away from that location. The Court also recognizes that Jones was handcuffed and was accompanied by at least one police officer. The Second Circuit has held that where, as here, the police are making a prompt and reasonable effort to identify the perpetrator, handcuffs and police custody are "necessary incidents of an on-the-scene identification" that do not "render the pre-trial

identification procedure unnecessarily suggestive." *Bautista*, 23 F.3d at 730 (show-up not unnecessarily suggestive where defendant was presented to the witness "in handcuffs; at night; in the custody of police officers; with his face lit by flashlights; and in the presence of [an officer] who, each time [the witness] identified a suspect, radioed to his fellow officers, '[I]t's a hit'"); *see also United States v. Butler*, 970 F.2d 1017, 1021 (2d Cir.) (identification proper where suspects were brought to victim who was sitting in a police car), *cert. denied*, 506 U.S. 980 (1992); *United States v. Sanchez*, 422 F.2d 1198, 1199-1200 (2d Cir. 1970) (police drove suspects by witnesses at the scene of the crime); *United States v. Ortiz*, No. 99 CR. 532 DC, 2000 WL 37998, at *1 (S.D.N.Y. Jan. 18, 2000) (defendants were in handcuffs, standing next to a marked police car, and accompanied by uniformed police officers); *Torrez v. Sabourin*, No. 00 CIV. 3286(AGS), 2001 WL 401444, at *5 (S.D.N.Y. Apr. 19, 2001) (identification not unduly suggestive where complainant identified defendant while he was on his hands and knees surrounded by police officers and patrol cars).

The Court concludes that state trial court correctly determined that the show-up identification procedure was not unduly suggestive. That holding, which was affirmed by the Appellate Division on appeal, was neither contrary to, nor an unreasonable application of clearly established Supreme Court precedent. Accordingly, this claim cannot provide a basis for habeas relief.

**4.     Fourth Amendment violation**

Jones contends that the trial court erred in denying his motion to suppress the evidence seized during his arrest. The Appellate Division summarily affirmed the trial court's ruling on direct appeal.

In *Stone v. Powell*, the Supreme Court held that "where the State has provided an *opportunity* for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." 428 U.S. 465, 481-82, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976) (emphasis added). Following *Stone v. Powell*, the Second Circuit developed a "litmus test to discern when a state prisoner has been denied an opportunity for full and fair litigation of his fourth amendment claims." *Capellan v. Riley*, 975 F.2d 67, 69-71 (2d Cir. 1992) (citing *Gates v. Henderson*, 568 F.2d 830 (2d Cir. 1977) (*en banc*), *cert. denied*, 434 U.S. 1038 (1978). The panel in *Gates* observed that "'all that the [Supreme] Court required was that the state [ ] provide[ ] the *opportunity* to the state prisoner for a full and fair litigation of the Fourth Amendment claim . . . .'" *Id.* (quoting *Gates*, 568 F.2d at 839) (emphasis in original). The Second Circuit concluded that review of Fourth Amendment claims presented by habeas petitioners would be undertaken in only one of two instances: (a) if the State provided no corrective procedures at all to redress the alleged Fourth Amendment violations; or (b) if the State has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an "unconscionable breakdown in the underlying process." *Id.* (quoting *Gates*, 568 F.2d 840 and citing *McPhail v. Warden, Attica Correctional Facility*, 707 F.2d 67, 70 (2d Cir. 1983)).

Notably, all that must be shown is that the State has provided an opportunity to litigate the petitioner's Fourth Amendment claim; it matters not whether the petitioner actually "took advantage of the State's procedure." *Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 2002). Indeed, as the Second Circuit has noted, "the 'federal courts have approved New York's

procedure for litigating Fourth Amendment claims, embodied in N.Y. Crim. Proc. Law § 710.10

*et seq.* (McKinney 1984 & Supp.1988), as being facially adequate.'" *Capellan*, 975 F.2d at 70 n.1

(quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989) and citing *Gates*, 568 F.2d at

837 & n. 4; *Shaw v. Scully*, 654 F. Supp. 859, 864 (S.D.N.Y. 1987)).

    Jones does not contend that New York failed to provide a corrective procedure to redress

his alleged fourth amendment claim. Rather, Jones appears to be arguing that the police officers

lacked reasonable suspicion to stop his car and detain him, as well as probable cause to arrest him.

This allegation is not sufficient to establish that "an unconscionable breakdown" occurred in the

existing process in violation of Jones' constitutional rights. *See Capellan*, 975 F.2d at 71 ("Even if

[petitioner] were correct in his allegation that the Appellate Division erroneously decided this

issue, a petitioner cannot gain federal review of a fourth amendment claim simply because the

federal court may have reached a different result.") (citing *Gates*, 568 F.2d at 839). The Second

Circuit explained that reading *Stone v. Powell* as requiring the reviewing court "to focus on the

correctness of the outcome resulting from the application of adequate state court corrective

procedures, rather than on the existence and application of the corrective procedures themselves, .

. . would be assuming, implicitly at least, that state courts were not responsible forums in which to

bring constitutional claims such as is presented herein." *Capellan*, 975 F.2d at 71. According to

the Second Circuit, *Stone v. Powell* "expressly discourage[d] [it] from making any such

assumption." *Id.* (citing 428 U.S. at 493-94 n. 35) ("[W]e are unwilling to assume that there now

exists a general lack of appropriate sensitivity to constitutional rights in the trial and appellate

courts of the several States.").

    Thus, to the extent that Jones claims that the Appellate Division erred in its ruling, this

does not give this Court the authority to review his claims "since a mere disagreement with the outcome of a state court ruling is not the equivalent of an unconscionable breakdown in the state's corrective process." *Id.* Accordingly, Jones' Fourth Amendment claims are not cognizable in this federal habeas proceeding.

**5.      Denial of petitioner's request to be seated in the spectator section of the courtroom**

Jones argues that the trial court erred in denying defense counsel's request to have him seated in the audience, rather than next to counsel, when the complaining witnesses testified at trial. Defense counsel argued that having Jones sit at the defense table would be unduly suggestive and tantamount to an in-court "show-up" identification. The trial court denied the request, noting that there was no possible manner in which Jones could be seated in the audience without segregating him since he necessarily would have to be seated next to a transport deputy and be in handcuffs due to his custody status.

As one district court in this Circuit has observed, "[f]ew cases directly have addressed whether circumstances surrounding an in-court identification can be considered impermissibly suggestive." *Bond v. Walker*, 68 F. Supp.2d 287, 298 (S.D.N.Y. 1999) (citing Evan J. Mandery, "*Legal Development: Due Process Considerations of In-Court Identifications*," 60 ALB. L. REV. 389, 389 (1996) ("Yet, while the constitutional issues surrounding pre-trial identifications have been widely litigated and explored by scholars, little attention has been paid to the issues raised by in-court identifications. The lack of appellate case law on the subject may be partially explained by the fact that few defendants ever object to the suggestiveness of in-court identifications. The near complete absence of law review articles on the subject is somewhat understandable . . . .")). The Second Circuit, however, has addressed the issue, but it was in review of a federal criminal

prosecution, *see United States v. Archibald*, 734 F.2d 938 (2d Cir. 1984).

When this argument was raised on Jones' direct appeal, appellate counsel cited *United States v. Archibald*, in which the defendant argued that "the in-court identifications were tainted by unduly suggestive circumstances, namely, that throughout the trial he was the only black person in the courtroom, except for one day when a black United States Marshal was present, and that he was seated at the defense table." 734 F.2d at 940. The trial court had dismissed defendant's request, made just prior to the start of trial, for a line-up to be held during trial was "just absolutely inappropriate." The trial court also denied defendant's request to be seated near other black men in the spectator section of the courtroom.

The Second Circuit agreed with the district court that there was no obligation to stage a lineup, but found that there was, however, an obligation to ensure that the in-court procedure here did not simply amount to a "show-up." *Id.* (citations omitted). The Second Circuit opined that defendant's request

> should not have been dismissed so quickly or so absolutely by the trial court. A fairly short delay of proceedings was all that would have been required to rearrange the seating in the courtroom and to secure the presence of some people of the defendant's approximate age and skin color. While it was not necessary for the court to conduct a true *Wade*-type of lineup, these relatively minor steps were required to ensure that the identification was not unfair. The in-court identification procedure utilized here was so clearly suggestive as to be impermissible, however traditional it may be.

*Id.* The Second Circuit agreed with defendant that "the suggestiveness of the situation was clearly indicated at trial" since "[o]ne of the three witnesses who identified Archibald stated on cross-examination that she 'had the feeling that he would be sitting next to' the defense lawyer in the courtroom." *Id.* The Second Circuit concluded that it was an "obviously suggestive

situation." *Id.*

Even though it found that the seating arrangement was suggestive, the Second Circuit nevertheless concluded that the error was harmless because the pre-trial identifications of the defendant from a photographic array were sufficient to support the conviction, without the in-court identification. *Id.* ("When the array with the photo of Archibald is compared to the surveillance photos, it is clear that the photographic identification testimony alone could have supported the conviction.") (citing *United States v. Magnotti*, 454 F.2d 1140, 1142 (2d Cir. 1972)). On rehearing, the Second Circuit clarified that it "wish[ed] to make it clear that in respect to that portion of [its] [prior] opinion relating to in-court procedures for identification[,] . . . special procedures are necessary only where (1) identification is a contested issue; (2) the defendant has moved in a timely manner prior to trial for a lineup; and (3) despite that request, the witness has not had an opportunity to view a fair out-of-court lineup prior to his trial testimony. . . ." *United States v. Archibald*, 756 F.2d 223, 223 (2d Cir. 1984).

Even if *Archibald* established constitutional standards applicable on habeas corpus review of a state conviction, a proposition about which the Court has doubts, Jones still would not be entitled to habeas relief. The Second Circuit made clear in its opinion issued after rehearing that "special procedures" are only necessary if "the defendant has moved in a timely manner prior to trial for a lineup." *United States v. Archibald*, 756 F.2d at 223; *see also United States v. Brown*, 699 F.2d 585, 594 (2d Cir. 1983); *United States v. Campbell*, 581 F.2d 22, 28 (2d Cir. 1978). Here, based on the record before the Court, Jones did not request a line-up for either of the witnesses, and he did not make his request for alternative seating arrangements until the second day of trial. Thus, Jones did not satisfy the *Archibald* requirement of a pre-trial motion for a

lineup and would not be entitled to relief thereunder, assuming that *Archibald* constitutes binding precedent with respect to deciding this state-court conviction habeas claim.[14]

6.     **Erroneous jury instruction on the issue of identification**

Jones argues that trial court's instruction to the jury on the issue of identification was erroneous because it failed to include certain language from New York's criminal pattern jury instructions. On direct appeal, the Appellate Division did not consider this claim on the merits but rather held that it was unpreserved for review since trial counsel failed to raise the issue during trial. *People v. Jones*, 289 A.D.2d at 962 ("Defendant failed to preserve for our review his contention that the jury instruction concerning identification testimony was inadequate, and we decline to exercise our power to review that contention as a matter of discretion in the interest of justice[.]") (citing N.Y. Crim. Proc. Law ("C.P.L.") §§ 470.05(2), 470.15(6)(a)). Respondent contends that this claim is procedurally defaulted because Appellate Division relied on New York's contemporaneous objection rule, C.P.L. § 470.05(2), which constituted an "adequate and independent" state basis for the decision.

The Supreme Court has made clear that the "adequate and independent state ground doctrine applies on federal habeas [review]," such that "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas

---

[14]     Moreover, the Court questions whether *Archibald* is binding precedent, particularly on this post-AEDPA federal habeas review of Jones' state-court conviction. The Court notes that *Archibald*, and the earlier Second Circuit decision in *Brown*, involved federal criminal prosecutions. In *Bond v. Walker*, 68 F. Supp.2d 287 (S.D.N.Y. 1999), the district court noted that in the fifteen-years since *Archibald* was decided, the case had not been applied by the Second Circuit, any district court in this Circuit, or any other federal court, on a habeas corpus review of a state trial identification by a witness who had *not* made a pretrial identification. 68 F. Supp.2d at 301. The Court agrees with the district court's assessment in *Bond* that it seems likely that the Second Circuit's decision in *Archibald* "was based not on any constitutional requirement but on the Second Circuit's supervisory authority over federal criminal trials." *Id.*

-47-

petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (citations and internal quotations omitted); *see also*, *e.g.*, *Schlup v. Delo*, 513 U.S. 298, 314-16, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). "[I]n order to preclude federal review [under the adequate and independent state ground doctrine], the last state court to render judgment must 'clearly and expressly state [ ] that its judgment rest[ed] on a state procedural bar.'" *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997) (quoting *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir.1996), *cert. denied*, 520 U.S. 1108, 117 S.Ct. 1116, 137 L.Ed.2d 317 (1997)).

In the present case, the Appellate Division "explicitly invoke[d] a state procedural bar rule as a separate basis for decision," *Harris v. Reed*, 489 U.S. at 264. The Appellate Division's statement that Jones' claim was "unpreserved " is sufficient to establish that it was relying on a procedural bar as an independent ground in disposing of the issue. *See id.* at 265 n. 12. Thus, this ruling constituted an "independent" state law ground for the decision. The ruling was also "adequate" inasmuch as the contemporaneous objection rule is "firmly established and regularly followed" by courts in New York state. *Garcia v. Lewis*, 188 F.3d 71, 79 (2d Cir. 1999); *accord*, *e.g.*, *Parreno v. Annetts*, No. 04 Civ.10153(GWG), 2006 WL 689511, at *8 (S.D.N.Y. Mar. 20, 2006) (holding that C.P.L. § 470.05(2) was an "adequate" basis for dismissing petitioner's claim that the trial court incorrectly charged the jury that he was an interested witness). Both statutory and New York case law indicate that a party must object to a jury charge in order to preserve the issue for appeal. *See Parreno*, 2006 WL 689511, at *8 (citing N.Y. Crim. Proc. Law § 470.05(2); *People v. Nuccie*, 57 N.Y.2d 818, 819 (1982); *People v. Moultrie*, 6 A.D.3d 730, 730 (App. Div.

2d Dept. 2004); *People v. Moore*, 300 A.D.2d 198, 198 (App. Div. 1ˢᵗ Dept. 2002); *People v. Mobley*, 176 A.D.2d 211, 211-12 (App. Div. 1ˢᵗ Dept. 1991)). Consistent with this approach, federal courts "have observed and deferred to New York's consistent application of its contemporaneous objection rules." *Garcia*, 188 F.3d at 79 (citations omitted); *see also Reyes v. Keane*, 118 F.3d 136, 138 (2d Cir.1997) ("A state prisoner who fails to object to a jury instruction in accordance with state procedural rules procedurally forfeits that argument on federal habeas review.") (citation omitted); *accord, e.g.*, *Bossett v. Walker*, 41 F.3d 825, 829 n. 2 (2d Cir. 1994), *cert. denied*, 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995). Accordingly, the Court concludes that the procedural rule relied upon by the Appellate Division in this case is "firmly established and regularly followed" in New York and therefore constitutes an "independent and adequate" state ground barring review of the merits of Jones' claim.

The Court notes that a petitioner may obtain habeas review of an otherwise procedurally defaulted claim only if he can show "cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris*, 489 U.S. at 262 (internal citations omitted); *accord, e.g.*, *Fama v. Commissioner of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir. 2000). In order to show a "fundamental miscarriage of justice," *Harris*, 489 U.S. at 262, a petitioner must demonstrate "actual innocence." *Calderon v. Thompson*, 523 U.S. 538, 559, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998); *accord Washington v. James*, 996 F.2d 1442, 1447 (2d Cir.1993), *cert. denied*, 510 U.S. 1078, 114 S.Ct. 895, 127 L.Ed.2d 87 (1994). Whether there is cause "ordinarily turn[s] on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Coleman v. Thompson*, 501 U.S. 722, 753, 111 S.Ct. 2546, 115 L.Ed.2d

640 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397

(1986)).

Jones has not alleged any facts that would constitute cause for default. Nor has he

demonstrated that he has suffered "'actual prejudice' resulting from the alleged error." *Bousley v.*

*United States*, 523 U.S. 614, 630, 118 S.Ct. 1604,  140 L.Ed.2d 828 (1998) (quoting *United*

*States v. Frady*, 456 U.S. 152, 167-168, 102 S.Ct. 1584, 1594-1595, 71 L.Ed.2d 816 (1982)).

Finally, Jones has not come forward with any "new evidence" to support a claim that he is

"actually innocent" of the charges on which he was convicted. *See Schlup v. Delo*, 513 U.S. at

327. Accordingly, the procedural default bars federal review of Jones's claims challenging the

acting-in-concert instruction.

**7.      Denial of right to be present at material stage of trial**

This claim stems from the interruption of Corban Rodman, one of the victims, while he

was testifying. Rodman was recounting the event of the evening he was robbed and the

prosecutor asked him if he saw the individual who was pointing a gun at his head during the

robbery. The following exchange occurred:

> Q:     And did you see the individual holding the weapon?
> A:     Yes.
> Q:     Do you see him here in the courtroom today?
> A:     Yeah.
> Q:     Could you point him out and describe what he's wearing, please?
> A:     I'm sorry, my eyes aren't so good.
> Q:     Are you okay?
> A:     Yeah.
> The Deputy:    There's water right there. Do you need a little air?
> The Witness:   I don't know. I think I'll be fine.
> The Court:     Why don't we take a recess.
> Mr. Kasperek:          Judge, if I could have an instruction that the witness
>                        not converse with anybody during the recess.

The Court:        I decline. Members of the jury, we will take our afternoon recess now. About five – fifteen minutes.

T.92-93. When the court reconvened, the trial judge announced that Rodman's testimony was going to be interrupted and that the prosecutor would call another witness. T.93. Defense counsel did not object to this change in schedule. *See id.*

On direct appeal, the Appellate Division held that it was "unable to review the further contention of defendant that he was denied his right to be present at a material stage of the trial. A defendant seeking reversal on appeal must provide the appellate court with an adequate record for determining whether [he was] wrongfully excluded from a material stage of trial, and defendant failed to do so here." *People v. Jones*, 289 A.D.2d at 963 (citation and quotation marks omitted). When Jones raised this claim in support of his C.P.L. § 440.10 motion, the state court denied it on the basis that the issue should have been raised on direct appeal but, in any event, was without merit as it was "based on sheer speculation." Respondent's Exhibit H at 296. Moreover, the state court found, Jones "did not have a legal right to be present at any conference involving matters of law or procedure that have no potential for meaningful input from him." *Id.* (citation and quotation marks omitted).

A criminal defendant has the right to be "present at all stages of the trial where his absence might frustrate the fairness of the proceedings," *Faretta v. California*, 422 U.S. 806, 820 n. 15, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) (citing *Snyder v. Massachusetts*, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), *overruled on other grounds by Malloy v. Hogan*, 378 U.S. 1, 2, 84 S.Ct. 1489, 1490, 12 L.Ed.2d 653, 653 (1964)); *accord, e.g.*, *Clark v. Stinson*, 214 F.3d 315, 323 (2d Cir. 2000), *cert. denied*, 531 U.S. 1116, 121 S.Ct. 865, 148 L.Ed.2d 778 (2001).

However, that right is not absolute; where a defendant is not "assure[d] the privilege of presence when presence would be useless, or the benefit but a shadow." *Snyder*, 291 U.S. at 107. Thus, under this standard, "the defendant's absence is reversible error only where it would have a 'relation, reasonably substantial, to his opportunity to defend.'" *Clark*, 214 F.3d at 323 (quoting *Snyder*, 291 U.S. at 105-06).

Jones contends that "[t]he decision to interrupt the testimony of Mr. Rodman was made by the prosecutor, and the court knew of the decision in advance" but that neither Jones nor his attorney were apprised of the development. Petition at 6-B (Docket No. 1). Jones has offered nothing, apart from his conclusory assertions, for finding that the decision to interrupt Rodman's testimony was made by the prosecutor and the trial court in advance. In other words, this Court lacks a basis for finding that Jones actually was excluded from a "material stage" of his trial.

Even if Jones were wrongfully excluded from a "material stage" of his trial, which this Court does not find to be the case, any error would be subject to review for harmlessness. "[V]iolations of the right to be present during all critical stages of the proceedings [are, in most cases] subject to harmless error analysis." *Rushen v. Spain*, 464 U.S. 114, 119 n. 2, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). However, if the violation "so fundamentally undermine[s] the fairness or the validity of the trial," it is properly characterized as a "structural" error and is subject to automatic reversal. *Yarborough v. Keane*, 101 F.3d 894, 897 (2d Cir. 1996); *see also Arizona v. Fulminante*, 499 U.S. 279, 307-10, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). To determine whether an error is properly categorized as structural, the Court must look "not only at the right violated, but also at the particular nature, context, and significance of the violation." *Yarborough*, 101 F.3d at 897.

The Court, in this case, has no difficulty in concluding that any error that occurred was not structural. *See*, *e.g.*, *Rushen*, 464 U.S. at 118 (holding that a defendant's absence from two conversations between the trial judge and a juror was a non-structural, harmless error); *Yarborough*, 101 F.3d at 897 (holding a brief hearing in the defendant's absence to determine whether a witness should be disqualified because he heard another witness's testimony did not constitute structural error, and was harmless); *United States v. Toliver*, 541 F.2d 958, 964-66 (2d Cir. 1976) (finding that defendant's absence during the testimony of two witnesses was harmless). To be sure, this was not a case in which "the defendant's absence undermined the fundamental integrity of the criminal process." Regardless of whether Jones was present or not, it seems clear that a recess would have been taken and the witness excused because he apparently was feeling ill. Furthermore, the Court finds it significant that defense counsel did not register any objection to the interruption; this further militates against finding that any error occurred. Given that defense counsel was so quick to request that Rodman be instructed not to converse with anybody during the recess, the Court presumes that if defense counsel had objected to excusing Rodman for the day, such concerns would have been placed on the record.

What Jones really appears to be complaining about is that when Rodman returned to testify the next day, he unequivocally identified Jones as the robber. The Court can see what Jones is suggesting–that Rodman was excused not because he was ill but because he was not testifying as the prosecutor wished. However, this mischaracterizes what occurred at trial. Rodman did not take the stand one day and testify that he could not identify the person who robbed him, and then return the next only to testify that he, indeed, could identify the perpetrator. To the contrary, Rodman clearly testified that he had opportunity to view the perpetrator during

-53-

the robbery, that he was able to identify the robber, and that the robber was in the courtroom that day. It was when Rodman was asked to describe the perpetrator that a recess was taken because he was apparently not feeling well. Thus, to the extent that Jones is urging the Court to infer that Rodman and the prosecutor colluded to present perjured testimony, the Court explicitly rejects any such claim.

**Petitioner's Request for a Hearing**

On January 19, 2005, a letter from Jones (Docket No. 11) was received by the Court. In it, Jones reiterates his request for a hearing "in regards to the sentencing issue that has been pending . . . for over a year . . . (*i.e.*, ground one of petition)." Petitioner's Motion for a Hearing at 1 (Docket No. 11). Jones continues,

> As you are already aware the U.S. Supreme Court made a ruling regarding the federal sentencing guidelines, and based on said ruling I believe I am entitled to a resentencing. . . . I have served a total of seven (7) years and eight (8) months under the illegal enhanced sentencing guidelines. I was sentenced as a predicate to fifteen (15) years flat for a class C Felony.

*Id.* (Docket No. 11). Respondent has opposed Jones' motion for a hearing, questioning how the federal sentencing guidelines relate to Jones' sentencing under New York State's Penal Law. *See* Respondent's Opposition to Petitioner's Request for a Hearing at 1 (Docket No. 12).

Jones has not specified the Supreme Court ruling upon which he relies to assert his entitlement to an evidentiary hearing; nor does he indicate how the ruling is pertinent to the sentencing claim raised in his habeas petition. The Court surmises that Jones may be referring to the Supreme Court's decision, *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), which affirmed the following rule, first announced in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000): "'*Other than the fact of a prior*

*conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'" *Blakely*, 542 U.S. at 301 (quoting *Apprendi*, 530 U.S. at 490) (emphasis added)).

Jones contends that his 1993 conviction for robbery, which was used to enhance his sentence for the conviction at issue here, was unconstitutional because he had been denied the effective assistance of counsel in regard to the 1993 conviction. To the extent that Jones is claiming that his sentence violated *Apprendi*, his claim is without merit because his enhanced sentence as a second felony offender was based only on the fact of a prior conviction, namely, the 1993 conviction. Indeed, Jones admitted that he was the person who pled guilty to third degree robbery on May 19, 1993. *See* Transcript of Second Felony Offender Hearing ("2FO Tr.") at 28. *Apprendi* explicitly provides an exception when "the fact of a prior conviction" is the source of the sentencing enhancement. *Accord Wheeler v. Phillips*, No. 05-CV-4399(JFB), 2006 WL 2357973, at *12 (E.D.N.Y. Aug. 15, 2006) (holding that habeas petitioner's *Apprendi* claims were meritless because his enhanced sentence was based only on the fact of a prior conviction); *United States v. Santiago*, 268 F.3d 151, 155 (2d Cir. 2001) (holding that defendant was not entitled to a fact-finding by a jury of prior convictions because *Apprendi* permits an except for the fact of a prior conviction). Furthermore, *Apprendi* only applies to enhanced sentences that exceed the applicable statutory maximum. *See Apprendi*, 530 U.S. at 490. Here, the maximum sentence  which Jones could have received was twenty-five years. Jones' sentence of fifteen years was well below the twenty-five year maximum. *See* N.Y. Penal Law § 70.06(6)(a). Accordingly, *Apprendi* was not violated. Indeed, the application of New York's second felony offender statute essentially increases the minimum sentence that the court may impose; it does not affect the

maximum penalty for which Jones was eligible based on his conviction for first degree robbery, a

Class B violent felony offense. *See Wheeler*, 2006 WL 2357973, *12 (citing *United States v.*

*King*, 345 F.3d 149, 151-52 (2d Cir. 2003) (noting that fact-finding by sentencing judge which

results in imposition of a mandatory minimum sentence, and does not increase the otherwise

applicable statutory maximum, does not trigger *Apprendi*'s requirements of having a jury find the

fact beyond a reasonable doubt).

In sum, as discussed above and elsewhere in this Decision and Order, Jones is not entitled

to be resentenced as the sentence he received was in all respects proper under the law. There is

no need for a hearing on this non-meritorious issue. Accordingly, Jones' request for a hearing

(Docket No. 11) is denied with prejudice.

## Petitioner's Motion for the Appointment of Counsel

Jones has submitted an application to have counsel appointed to represent him in

connection with the instant habeas corpus petition. *See* Docket No. 14. Jones indicates that he

does not have the funds to pay for an attorney and, in the attached affidavit in support of his

request to proceed *in forma pauperis*, he sufficiently documents his indigence.

It is well settled that a petitioner does not have a Sixth Amendment right to counsel in a

habeas proceeding. *See Pennsylvania v. Finley*, 481 U.S. 551, 555, 107 S.Ct. 1990, 95 L.Ed.2d

539 (1987); *Green v. Abrams*, 984 F.2d 41, 47 (2d Cir. 1993). However, the Second Circuit has

explained that pursuant to 28 U.S.C. § 1915(d), a district judge has the discretion to appoint

counsel for indigents in civil cases: "The court may request an attorney to represent any such

person unable to employ counsel and may dismiss the case if the allegation of poverty is untrue,

or if satisfied that the action is frivolous or malicious." 28 U.S.C. § 1915(d) (quoted in *Hodge v.*

*Police Officers*, 802 F.2d 58, 60 (2d Cir. 1986)). The Second Circuit has held that "[i]n habeas

corpus cases, counsel must be appointed for qualified indigents when a hearing is required; the

court may appoint counsel at an earlier stage if it deems appointment desirable." *Hodge*, 802 F.2d

at 60 (citing Rules Governing Section 2254 Cases in the United States District Courts, Rule 8(c)

and Advisory Committee Notes).

In *Hodge*, the Second Circuit offered the following guidance for exercising that

discretion:

> In deciding whether to appoint counsel, however, the district judge should first
> determine whether the indigent's position seems likely to be of substance. If the
> claim meets this threshold requirement, the court should then consider the
> indigent's ability to investigate the crucial facts, whether conflicting evidence
> implicating the need for cross-examination will be the major proof presented to
> the fact finder, the indigent's ability to present the case, the complexity of the
> legal issues and any special reason in that case why appointment of counsel would
> be more likely to lead to a just determination

*Id.* at 61-62; *accord Cooper v. A. Sargenti Co.*, 877 F.2d 170, 174 (2d Cir.1989); *Hendricks v.*

*Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997) (noting that *Cooper* reconfirmed *Hodge* "while

cautioning against an equally Pavlovian appointment of counsel whenever an indigent litigant

seeks to ring the appointment bell"). The Second Circuit has observed that because "[v]olunteer

lawyer time is a precious commodity," *Cooper*, 877 F.2d at 172, courts should not grant *pro*

*bono* representation to a plaintiff with "a meritless case that no lawyer would take" were the

plaintiff able to afford counsel, *id.* at 174.

As to the first *Hodge* factor, the Court concludes that, after reviewing the entire record in

this case, the *Batson* issue involving the prosecutor's peremptory challenge of Ms. Peters is, in

fact, "of substance," 802 F.2d at 60. As stated above in this Decision and Order, the Court has

granted Jones a Certificate of Appealability as to that issue. Because Jones' *Batson* claim is

adequately set forth in the trial record, Jones will not likely have to "investigate the crucial facts"

or engage in cross-examination, *see id.*. However, the Court's review of the pertinent case law

makes clear that the statistical and legal analyses called for in *Batson* claims similar to Jones' can

be fairly complex and subtle. In light of that factor, and because the Court believes that Jones'

*Batson* claim regarding Ms. Peters potentially has merit, the Court determines that it should grant

Jones' motion for the appointment of counsel. Accordingly, in the interests of justice, it is hereby

ordered that counsel from the Criminal Justice Act panel be assigned to represent Jones and to

file an appellate brief on his behalf regarding the issue on which this Court has granted a

Certificate of Appealability.

## CONCLUSION

For the reasons set forth above, petitioner Wendyll Jones' petition for a writ of habeas

corpus is **DENIED** and the petition (Docket No. 1) is **DISMISSED**.

However, as discussed above, the Court believes that Jones has made a "substantial

showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2) with respect to

the state courts' conclusion that petitioner failed to set forth a *prima facie* case of discrimination

under *Batson v. Kentucky* with respect to the prosecutor's peremptory strike of Ms. Peters. *See*

*Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 112 (2d Cir. 2000) ("The Supreme

Court has held that a 'substantial showing' does not compel a petitioner to demonstrate that he

would prevail on the merits, but merely that the issues involved in his case 'are debatable among

jurists of reason; that a court could resolve the issues [in a different manner]; or that the

questions are adequate to deserve encouragement to proceed further.'") (citations and quotations

omitted; alterations in original)). Therefore, the Court **GRANTS** a Certificate of Appealability issue with respect to this question only. Because Jones has failed to make a substantial showing of a denial of a constitutional right on the remaining issues presented in his petition, as to those issues the Court declines to issue a certificate of appealability. *See* 28 U.S.C. §2253(c)(2).

Furthermore, the Court **GRANTS** Jones' application for assigned counsel (Docket No. 14). Accordingly, it is hereby **ORDERED** that counsel from the Criminal Justice Act panel be assigned to file an appellate brief on his behalf regarding the issue on which this Court has granted a Certificate of Appealability.

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: February 16, 2007
      Rochester, New York.